659 A.2d 450

L.M., PETITIONER–APPELLANT, v. STATE OF NEW JERSEY, DI-
VISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES,
RESPONDENT–RESPONDENT, AND MIDDLESEX COUNTY
BOARD OF SOCIAL SERVICES, RESPONDENT.

Argued January 30, 1995—Decided June 7, 1995.

*Kathryn A. Brock* argued the cause for appellant.

*John K. Worthington,* Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Leighton A. Holness* argued the cause for *amicus curiae* Legal Services of New Jersey, Inc. (*Melville D. Miller, Jr.,* President, attorney; *Mr. Miller, Mr. Holness,* and *John H. Fitzgerald,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

The issue in this appeal arises from an elderly couple's attempt to avoid the so-called "Medicaid Gap," a term used to describe a level of income that is "just above the Medicaid cut-off yet too low to cover the cost of nursing home care." Jill Quadagno et al., *Falling into the Medicaid Gap: The Hidden Long–Term Care Dilemma,* 31 *The Gerontologist* 521, 521 (1991). That is the quandary that confronted petitioner when he applied for Medicaid benefits to cover the cost of his nursing-home care. L.M.'s initial application for Medicaid benefits was denied because his combined income from Social Security and his private pension placed him above the "income cap" for eligibility. Thereafter, L.M. and his wife of over fifty years divorced, and the Chancery Division equitably distributed L.M.'s pension to his wife, reducing L.M.'s income below the "income cap." When L.M. reapplied for benefits, the Department of Human Services, Division of Medical

Assistance and Health Services (DHS–DMAHS) continued to include L.M.'s pension as available income in assessing his Medicaid eligibility, and again denied his application for benefits. In an unreported opinion, the Appellate Division affirmed. We granted certification, 138 *N.J.* 265, 649 *A.*2d 1286 (1994).

I

The facts in this matter are undisputed. In February 1992, L.M., a seventy-five-year-old man, suffered a stroke and was admitted to the Somerset Medical Center. He was later transferred to the Veterans Memorial Home in Paramus, New Jersey, where he continues to reside.

In March 1992, L.M. applied for Medicaid benefits to pay for his nursing-home care. The Middlesex County Board of Social Services (Board) denied L.M.'s application in April 1992 because his monthly income exceeded the eligibility limit set forth in *N.J.A.C.* 10:71–5.6, which at that time was $1,266.00. The Board concluded that L.M.'s monthly income totaled $1,441.17. He received $783.80 per month in Social Security and $657.37 per month in pension benefits from Union Carbide Corporation (Union Carbide).

In July 1992, the Chancery Division declared L.M. a mental incompetent. Based on supporting certifications from examining physicians, the court found that he was "incapable of governing himself and managing his affairs." The court appointed L.M.'s daughter as his guardian.

Thereafter, L.M.'s wife, to whom he had been married since 1939, filed a complaint for divorce from bed and board pursuant to *N.J.S.A.* 2A:34–3. (A divorce from bed and board "does not dissolve the marital bond but merely decrees a judicial separation." 1 Gary N. Skoloff & Laurence J. Cutler, *New Jersey Family Law Practice* § 2.6, at 2–27 (5th ed. 1984) (citation omitted). However, "all property rights of the parties are treated as though a judgment of absolute divorce has been entered." *Id.* at 2–28.) In October 1992, the Chancery Division entered a

judgment of divorce from bed and board. That judgment adopted a separation-and-property-settlement agreement that had been executed earlier by L.M.'s wife and his guardian. Concerning equitable distribution of marital property, the agreement provided that L.M.'s wife was to receive all of L.M.'s interest in his Union Carbide pension plan.

On that same date, the court entered a Qualified Domestic Relations Order (QDRO) that reflected the provisions of the agreement. The QDRO directed the administrator of the Union Carbide pension plan to pay to the "alternate payee," L.M.'s wife, "the benefits of the plan as if she were the employee pension beneficiary" starting in November 1992. Specifically, it ordered the administrator to pay L.M.'s wife "$657.37 per month plus all increases to which the participant may have been entitled."

Shortly before the court entered the judgment of divorce from bed and board, L.M.'s guardian again applied for Medicaid benefits. She included in the application copies of the soon-to-be-filed judgment of divorce from bed and board and the QDRO. In November 1992, the Board denied that application because of excessive monthly income. Discussing the QDRO's treatment of L.M.'s Union Carbide pension, the Board reasoned that "[t]his diversion of income is not recognized under prevailing Medicaid regulations." Accordingly, the Board concluded that L.M.'s monthly income remained at $1,441.17, which exceeded the income cap of $1,266.00 established by *N.J.A.C.* 10:71–5.6.

Thereafter, L.M.'s guardian requested a hearing, which was held in March 1993. In April 1993, an Administrative Law Judge (ALJ) reversed the Board's decision to deny Medicaid benefits to L.M., reasoning that under the Medicaid regulations only "available" income is considered in determining eligibility. Available income is defined under *N.J.A.C.* 10:71–5.1(b)1.i as income that a person actually receives. Based on the QDRO, the ALJ concluded that the pension payment of $657.37 per month from Union Carbide was no longer available to L.M. as income. Accordingly, L.M.'s monthly income, which consisted solely of his Social Securi-

ty payments of $783.80, fell below the income cap of $1,266.00, thereby entitling him to Medicaid benefits.

The Director of the DHS–DMAHS reversed the ALJ's determination, holding that the Board had properly considered L.M.'s pension income in denying his application. The Director reasoned that "[r]educing L.M.'s countable gross income as a result of a [QDRO] would effectively eliminate the meaning of the Medicaid income eligibility standard for those who would divest themselves of pension or other income through that vehicle."

The Appellate Division affirmed, concluding that "the Director's decision that L.M.'s pension was income which was available to him, even though being paid to his former spouse pursuant to a QDRO, and thus includable when determining L.M.'s Medicaid eligibility, was correct." The court further noted that "[t]o reverse the Director on the present record could have the result of encouraging parties to secure divorces in order to establish Medicaid eligibility."

## II

The Medicaid program, enacted in 1965 as Title XIX of the Social Security Act, "is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." *Atkins v. Rivera,* 477 *U.S.* 154, 156, 106 *S.Ct.* 2456, 2458, 91 *L.Ed.*2d 131, 137 (1986). The program is a cooperative federal-state endeavor in which the federal government provides "financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae,* 448 *U.S.* 297, 301, 100 *S.Ct.* 2671, 2680, 65 *L.Ed.*2d 784, 794 (1980). "In return, participating States are to comply with requirements imposed by the [program] and by the Secretary of Health and Human Services." *Atkins, supra,* 477 *U.S.* at 157, 106 *S.Ct.* at 2458, 91 *L.Ed.*2d at 137. Each state must develop a plan that includes "reasonable standards ... for determining eligibility for and the extent of medical assistance ... [that is] consistent with the objectives" of the Medicaid program. 42

U.S.C.A. § 1396a(a)(17)(A). An applicant is entitled to Medicaid benefits "if he fulfills the criteria established by the State in which he lives." *Schweiker v. Gray Panthers,* 453 *U.S.* 34, 36–37, 101 *S.Ct.* 2633, 2636, 69 *L.Ed.*2d 460, 465 (1981). By enacting the New Jersey Medical Assistance and Health Services Act, *N.J.S.A.* 30:4D–1 to –19.1, New Jersey has elected to participate in the Medicaid program. The Department of Human Services is the agency responsible for administering the Medicaid program in New Jersey. *See N.J.S.A.* 30:4D–3c.

States that participate in the Medicaid program must provide coverage to the "categorically needy," which includes persons eligible to receive benefits under Aid to Families with Dependent Children (AFDC), 42 *U.S.C.A.* §§ 601–617, or Supplemental Security Income for the Aged, Blind, and Disabled under Title XVI of the Social Security Act (SSI), 42 *U.S.C.A.* §§ 1381–1383d. *See* 42 *U.S.C.A.* § 1396a(a)(10)(A)(i). The categorically needy are "persons whom Congress considered especially deserving of public assistance because of family circumstances, age, or disability." *Gray Panthers, supra,* 453 *U.S.* at 37, 101 *S.Ct.* at 2636–37, 69 *L.Ed.*2d at 465–66 (footnote omitted); *see also Schweiker v. Hogan,* 457 *U.S.* 569, 572–73, 102 *S.Ct.* 2597, 2601, 73 *L.Ed.*2d 227, 231–32 (1982) (noting that categorically needy are " 'the most needy in the country and it is appropriate for medical care costs to be met, first, for these people' ") (quoting H.R.Rep. No. 213, 89th Cong., 1st Sess. 66 (1965)).

The Medicaid program further "offers participating States the option of providing Medicaid assistance to certain other groups of individuals, one of which is the 'optional categorically needy.' " *Herweg v. Ray,* 455 *U.S.* 265, 268–69, 102 *S.Ct.* 1059, 1063, 71 *L.Ed.*2d 137, 142 (1982) (citation omitted). The optional categorically needy are statutorily defined at 42 *U.S.C.A.* § 1396a(a)(10)(A)(ii). *See Skandalis v. Rowe,* 14 *F.*3d 173, 175 (2d Cir.1994) ("The line between mandatory and optional coverage is primarily drawn in § 1396a(a): mandatory coverage is specified in § 1396a(a)(10)(A)(i), and the state options are set forth in subsec-

tion (ii). The groups specified in these sections are collectively referred to ... as the 'categorically needy.' ").

Specifically, 42 *U.S.C.A.* § 1396a(a)(10)(A)(ii)(V) permits states to provide "optional categorically needy" coverage to persons receiving long-term care in a medical institution, such as a nursing home, who satisfy certain resource requirements and whose income does not exceed the limitation provided in 42 *U.S.C.A.* § 1396b(f)(4)(C), which sets the ceiling at 300 percent of the benefit rate established by SSI. Significantly, 42 *U.S.C.A.* § 1396a(a)(10)(A)(ii)(V) imposes "an income cap on these individuals." *New Mexico Dep't of Human Servs. v. Department of Health & Human Servs. Health Care Fin. Admin.,* 4 *F.*3d 882, 883 (10th Cir.1993). That means that persons whose income exceeds the limitation "are not allowed to pay as much as they can, and have Medicaid pay the balance, but instead are totally disqualified for any Medicaid assistance." *Miller v. Ibarra,* 746 *F.Supp.* 19, 20 (D.Colo.1990). New Jersey has chosen to provide coverage to "optional categorically needy" persons. *See N.J.S.A.* 30:4D–3i(7) (defining "qualified applicant" as person who "[m]eets the standard of need applicable to his circumstances under a categorical assistance program ... but is not receiving such assistance and applies for medical assistance only"); *N.J.A.C.* 10:71–3.14, –4.8 (establishing eligibility requirements for persons in medical institutions applying for Medicaid only). At the time that L.M. applied for benefits, the income cap for persons receiving long-term nursing-home care was $1,266.00. 24 *N.J.R.* 652 (Feb. 18, 1992).

In determining whether income is excessive, Congress has required the states to adopt a methodology that takes "into account only such income ... as [is], as determined in accordance with standards prescribed by the Secretary, available to the applicant." 42 *U.S.C.A.* § 1396a(a)(17)(B). Because of that delegation of authority, the Supreme Court has stated that the Secretary's definition of available income "is entitled to 'legislative effect' because, '[i]n a situation of this kind, Congress entrusts to

the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term.'" *Gray Panthers, supra,* 453 *U.S.* at 44, 101 *S.Ct.* at 2640, 69 *L.Ed.*2d at 470 (quoting *Batterton v. Francis,* 432 *U.S.* 416, 425, 97 *S.Ct.* 2399, 2405, 53 *L.Ed.*2d 448, 456 (1977)). The Secretary has defined "income" under SSI to include "anything you receive in cash or in kind that you can use to meet your needs for food, clothing, and shelter. Sometimes income also includes more or less than you actually receive." 20 *C.F.R.* § 416.1102 (citations omitted). Specifically, unearned income, such as private-pension benefits, 20 *C.F.R.* § 416.1121(a), counts toward eligibility "[w]hen you receive it or when it is credited to your account or set aside for your use," 20 *C.F.R.* § 416.1123(a), "includ[ing] more than you actually receive if amounts are withheld from unearned income because of a garnishment, or to pay a debt or other legal obligation." 20 *C.F.R.* § 416.1123(b)(2).

DHS–DMAHS also has adopted a regulation that defines income, which states in part: "In order to be considered in the determination of eligibility, income must be 'available.' Income shall be considered available to an individual when ... the individual actually receives the income." *N.J.A.C.* 10:71–5.1(b)1.i. Although that standard appears to be in tension with the controlling federal regulations, 42 *U.S.C.A.* § 1396a(r)(2)(A)(i) permits a state to adopt an income methodology for the optional categorically needy that is "less restrictive" than the SSI methodology. *See Georgia, Dep't of Medical Assistance v. Shalala,* 8 *F.*3d 1565, 1568–69 (11th Cir.1993). Under a less-restrictive methodology, "additional individuals may be eligible for medical assistance and no individuals who are otherwise eligible are made ineligible for such assistance." 42 *U.S.C.A.* § 1396a(r)(2)(B).

The Medicaid program also provides states with the option of offering assistance "to the 'medically needy,' that is, persons who meet the nonfinancial eligibility requirements for cash assistance under AFDC or SSI, but whose income or resources exceed the financial eligibility standards of those programs." *Rivera, supra,*

477 *U.S.* at 157, 106 *S.Ct.* at 2459, 91 *L.Ed.*2d at 137; *see* 42 *U.S.C.A.* § 1396a(a)(10)(C). The medically needy may qualify for assistance if they incur medical expenses "in an amount that effectively reduces their income to the eligibility level. Only when they 'spenddown' the amount by which their income exceeds that level, are they in roughly the same position as persons eligible for AFDC or SSI...." *Id.* at 158, 106 *S.Ct.* at 2459, 91 *L.Ed.*2d at 137–38; *see* 42 *U.S.C.A.* § 1396a(a)(17) (creating spend-down mechanism). New Jersey has chosen to provide assistance to the medically needy. *See N.J.S.A.* 30:4D–3i(8); *N.J.A.C.* 10:70–1.1 to –7.3. Unlike other states, however, New Jersey's medically needy program does not extend coverage to persons requiring long-term nursing-home care.

We note that as part of the Omnibus Budget Reconciliation Act of 1993 (OBRA '93), Pub.L. No. 103–66, Congress expressly provided for the creation of so-called "Miller Trusts," which permit "persons in income cap states whose fixed income places them over the income limit ... nevertheless [to] qualify for Medicaid nursing home benefits." Sanford J. Schlesinger & Barbara J. Scheiner, *OBRA '93 Makes Sweeping Changes in Medicaid Rules,* 21 *Est. Plan.* 74, 80 (1994). (Those trusts are so named because a precursor to the current codified version, involving the judicial creation of trusts for incompetent persons, was initially accepted in *Miller, supra,* 746 *F.Supp.* 19, as a method of excluding income for eligibility purposes, thereby avoiding the income cap.) Presently, in a state such as New Jersey, which provides for nursing-home coverage under 42 *U.S.C.A.* § 1396a(a)(10)(A)(ii)(V) but does not provide such coverage under the medically needy program, a trust containing "pension, Social Security, and other income to the individual" can be established under federal law to exclude that income from a Medicaid eligibility determination. 42 *U.S.C.A.* § 1396p(d)(4)(B)(i). That trust, however, must provide that "the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan." 42 *U.S.C.A.* § 1396p(d)(4)(B)(ii). Accordingly, those trusts provide a

mechanism that prevents persons requiring long-term nursing-home care from becoming caught in the "Medicaid Gap," and also helps to preserve the financial integrity of the Medicaid program.

We further recognize that the Governor, in her budget proposal for fiscal year 1996, recommends authorizing DHS–DMAHS to provide coverage for nursing-home services through New Jersey's medically needy program. Governor Christine Todd Whitman, *State of New Jersey [Proposed] Budget Fiscal Year 1995–96*, at E–15 (Jan. 23, 1995). That change would eliminate the "Medicaid Gap" problem by allowing persons to spend down their income on the costs of their care to qualify for coverage. New Jersey would then fall in line with the national trend: the overwhelming majority of states with a medically needy program provide long-term nursing-home coverage through that program. *See* Quadagno, *supra*, 31 *The Gerontologist* at 521.

Both Congress's codification of Miller Trusts and the Governor's proposal to cover nursing-home care through the medically needy program are measures that are responsive to the "Medicaid Gap" problem. Unfortunately, L.M. encountered a more rigid Medicaid system when he sought benefits. He faced the income cap imposed by 42 *U.S.C.A.* § 1396a(a)(10)(A)(ii)(V) prior to the Congressional authorization of Miller Trusts in 1993. In that context, L.M. and his wife of fifty-three years divorced, presumably motivated wholly or in part by a desire to enable L.M. to receive Medicaid benefits. We now turn to the issues raised by L.M.'s appeal, to determine whether the Board properly denied his application for benefits when he applied under the system in place in 1992.

### III

Generally, we will not reverse the decision of an administrative agency unless it is arbitrary, capricious, or unreasonable or is not supported by substantial credible evidence in the record as a whole. *Dennery v. Board of Educ.*, 131 *N.J.* 626, 641, 622 *A.*2d 858 (1993). An "agency's interpretation of the operative law is

entitled to prevail, so long as it is not plainly unreasonable." *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984). "When an agency's decision is manifestly mistaken, however, the interests of justice authorize a reviewing court to shed its traditional deference to agency decisions." *P.F. v. New Jersey Div. of Developmental Disabilities,* 139 *N.J.* 522, 530, 656 *A.*2d 1 (1995).

In affirming the decision of the Director of DHS–DMAHS to deny L.M.'s application for Medicaid benefits, the Appellate Division relied solely on *Estate of G.E. v. Division of Medical Assistance & Health Services,* 271 *N.J.Super.* 229, 638 *A.*2d 833 (App. Div.1994). In that case, G.E., who suffered from Alzheimer's disease, was admitted into a nursing home in November 1991. At that time he was receiving a pension of $1,012.67 per month and Social Security benefits of $895 per month. *Id.* at 230, 638 *A.*2d 833. Because the cost of the nursing-home care left V.E., G.E.'s wife, unable to meet her own financial needs, she filed an action in the Chancery Division seeking spousal support. In January 1992, the court entered a QDRO that directed the administrator of G.E.'s pension fund to pay V.E. the entire monthly pension benefit as support. "Although G.E.'s pension administrator continued to draw checks in the name of G.E., V.E. cashed the checks and applied the proceeds to her own living expenses." *Id.* at 231, 638 *A.*2d 833. That same month, V.E. applied for Medicaid benefits on behalf of her husband.

The Appellate Division affirmed the decision of the Director of DHS–DMAHS that the court-ordered transfer of G.E.'s pension benefits to support V.E. did not render them unavailable to G.E. for the purpose of determining his monthly income, and that G.E. was ineligible for Medicaid due to excessive income. Initially, the court determined that "the Secretary's position, now formalized in 20 *C.F.R.* [§] 416.1123(b)(2), that amounts paid to satisfy support orders constitute 'available income' for Medicaid eligibility purposes," was a valid exercise of regulatory authority under 42 *U.S.C.A.* § 1396a(a)(17)(B). *Estate of G.E., supra,* 271 *N.J.Super.*

at 235, 638 *A*.2d 833. That conclusion was supported by a considerable number of federal and state authorities. *See, e.g., Himes v. Shalala*, 999 *F*.2d 684, 688–91 (2d Cir.1993); *Peura ex rel. Herman v. Mala*, 977 *F*.2d 484, 492 (9th Cir.1992); *Emerson v. Steffen*, 959 *F*.2d 119, 124 (8th Cir.1992); *Clark v. Commissioner of Income Maintenance*, 209 Conn. 390, 551 *A*.2d 729, 736 (1988).

Next, the *Estate of G.E.* court addressed whether *N.J.A.C.* 10:71–5.1(b)1.i, which describes income as available if "the individual actually receives the income," provides a "less restrictive income eligibility standard[ ] for Medicaid applicants by excluding payments under a spousal support order from an applicant's countable income," pursuant to 42 *U.S.C.A.* § 1396a(r)(2)(A)(i). 271 *N.J.Super.* at 237, 638 *A*.2d 833. The court noted that the New Jersey regulation initially had been adopted in 1976, more than eleven years before Congress had authorized the states to establish income methodologies that were less restrictive than the federal standard. In fact, the Director previously indicated that the regulation "establish[es] a uniform system of determining eligibility for all applicants under the same criteria established by the Federal government for eligibility determinations in the [SSI] program." 15 *N.J.R.* 1000 (June 20, 1983). However, when the regulation was proposed for further readoption in 1990, the Director noted that "except where Federally required or where the Federal statute authorizes exceptions to the SSI policy, these rules follow the SSI eligibility process." 22 *N.J.R.* 3357 (Nov. 5, 1990). Although the court acknowledged that the Director's 1990 statement "could be read to suggest that New Jersey has adopted broader eligibility standards than are mandated by the Federal Medicaid Act," it rejected the conclusion that "the oblique 'actually receives' language of *N.J.A.C.* 10:71–5.1(b)(1)(i) can be reasonably construed as an affirmative expression of an intent to adopt more liberal state Medicaid eligibility standards." *Estate of G.E., supra*, 271 *N.J.Super.* at 238, 638 *A*.2d 833. Accordingly, the court found that G.E.'s application for Medicaid benefits had been properly rejected.

L.M. argues that *Estate of G.E.* is distinguishable and presents a fundamentally different legal issue. *Estate of G.E.* involved whether G.E.'s pension could be considered available income for Medicaid eligibility purposes despite G.E.'s spousal-support obligation. In this case, L.M. and his spouse divorced, with his spouse receiving his pension through equitable distribution. Accordingly, L.M. contends that the Court first must determine whether L.M. or his spouse is the owner of the pension: if the Court determines that L.M.'s spouse now owns the pension, then the pension cannot be considered in assessing L.M.'s Medicaid eligibility because pension benefits owned by L.M.'s spouse cannot constitute available income to L.M. under either the federal or New Jersey regulations that define income. In response, the Attorney General argues that the issue in this case is "identical" to that addressed by the Appellate Division in *Estate of G.E.*, asserting that there is "no valid distinction" between the support obligation in *Estate of G.E.* and the equitable distribution of the pension in this case.

We agree that we must initially address the issue of ownership of the pension. "While the Medicaid statute provides a detailed definition of income for purposes of th[e] [income] cap, it does not specify rules for determining *ownership* of that income, particularly as between spouses." *New Mexico, supra,* 4 *F.*3d at 883; *accord Purser v. Rahm,* 104 Wash.2d 159, 702 *P.*2d 1196, 1201 (1985) ("Nothing in the Medicaid statute or regulations establishes federal criteria for determining *ownership* of income."), *cert. dismissed,* 478 *U.S.* 1029, 107 *S.Ct.* 8, 92 *L.Ed.*2d 763 (1986). The Medicaid statute's lack of attention to ownership "may be explained by the limited context in which it arises. So long as a husband and wife reside together, their income and assets are counted together and 'deemed' available to each other for the purposes of determining eligibility for, and the amount of, Medicaid benefits." *Purser, supra,* 702 *P.*2d at 1200 (citing *Herweg, supra,* 455 *U.S.* at 265, 102 *S.Ct.* at 1059, 71 *L.Ed.*2d at 137; *Gray Panthers, supra,* 453 *U.S.* at 39, 101 *S.Ct.* at 2638, 69 *L.Ed.*2d at

460). Accordingly, "the question of ownership does not ordinarily arise in determining eligibility." *Purser, supra*, 702 *P*.2d at 1200.

When one spouse enters a nursing home, however, the issue of ownership becomes relevant. Under federal law, when "the applicant enters a nursing home, the spouse's income continues to be deemed 'available' during the first month of separation[ ] [but] [t]hereafter, mutual consideration of spousal income ceases unless the spouse's income is actually contributed." *Washington, Dep't of Social & Health Servs. v. Bowen*, 815 *F*.2d 549, 553 (9th Cir.1987) (citation omitted). In the context of determining ownership of income between a person in a nursing home and his or her spouse, several courts have addressed whether the so-called "name-on-the-check" rule adopted by the Secretary, which attributes to each spouse the income earned in his or her own name, may be supplanted by a state's community-property principles, under which one-half of the couple's combined income is attributed to each spouse. (The name-on-the-check rule "has no explicit basis in either the Medicaid statute or Medicaid regulations," *ibid.*, but instead represents the Secretary's administrative interpretation of the Medicaid regulations.)

For example, in *New Mexico, supra*, the New Mexico Department of Human Services, along with a class of aged, blind, and disabled married persons needing nursing-home care, challenged the Secretary's decision to disapprove of New Mexico's Medicaid plan because it had supplanted the name-on-the-check rule with community-property principles. The class members alleged that because the bulk of the income supporting them and their respective spouses had happened to be paid in their name, the Secretary's rule disqualified them from Medicaid although their true personal income under New Mexico community-property law fell under the income cap. *New Mexico, supra*, 4 *F*.3d at 884.

Addressing that claim, the Court of Appeals for the Tenth Circuit initially acknowledged that the Secretary possesses broad discretion, but emphasized that the exercise of that discretion must be evaluated within "the structure of the Medicaid program

and the nature of the legal landscape in which it is located" to resolve whether the Secretary's decision was consistent with Congressional intent. *New Mexico, supra,* 4 *F.*3d at 885. The court noted that " ' "Congress acts ... against the background of the total *corpus juris* of the states." ' " *Ibid.* (quoting *Wallis v. Pan Am. Petroleum Corp.,* 384 *U.S.* 63, 68, 86 *S.Ct.* 1301, 1304, 16 *L.Ed.*2d 369, 373 (1966) (quoting Henry M. Hart Jr. & Herbert Wechsler, *The Federal Courts and the Federal System* 435 (1953))). By way of example, the *New Mexico* court noted that in the tax area, if the federal statutory provisions define income but fail to define what ownership entails, state law determines the owner of the income. 4 *F.*3d at 885; *see also United States v. Mitchell,* 403 *U.S.* 190, 197, 91 *S.Ct.* 1763, 1768, 29 *L.Ed.*2d 406, 412 (1971) ("In the determination of ownership [of income], state law controls."); *Poe v. Seaborn,* 282 *U.S.* 101, 109–10, 51 *S.Ct.* 58, 58–59, 75 *L.Ed.* 239, 243 (1930) (noting that term "income of" in federal tax statute indicates ownership as defined under state law).

Next, the *New Mexico* court emphasized that "the particular area of state law with which we are concerned, dealing with matters of family relations ordinarily reserved from federal encroachment, weighs heavily in favor of honoring the state's policy choices." 4 *F.*3d at 885. In fact, the Supreme Court has stated that state family-property law is not to be displaced by federal legislation absent an affirmative expression of such Congressional intent and a compelling federal need:

> Insofar as marriage is within temporal control, the States lay on the guiding hand. The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States. Federal courts repeatedly have declined to assert jurisdiction over divorces that presented no federal question. On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has positively required by direct enactment that state law be pre-empted. A mere conflict in words is not sufficient. State family and family-property law must do major damage to clear and substantial federal interests before the Supremacy Clause will demand that state law be overridden.

[*Hisquierdo v. Hisquierdo,* 439 *U.S.* 572, 581, 99 *S.Ct.* 802, 808, 59 *L.Ed.*2d 1, 10–11 (1979) (internal citations and quotation marks omitted).]

*See also Mansell v. Mansell,* 490 *U.S.* 581, 587, 109 *S.Ct.* 2023, 2028, 104 *L.Ed.*2d 675, 684 (1989) ("Because domestic relations are preeminently matters of state law, we have consistently recognized that Congress, when it passes general legislation, rarely intends to displace state authority in this area."). The Supreme Court has further noted that when analyzing programs like Medicaid, "[w]here coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." *New York State Dep't of Social Servs. v. Dublino,* 413 *U.S.* 405, 421, 93 *S.Ct.* 2507, 2517, 37 *L.Ed.*2d 688, 699 (1973).

In that context, the *New Mexico* court noted Congress's silence on the issue of ownership of income and concluded that express preemption was lacking. Furthermore, it rejected the notion that application of New Mexico's community-property laws to determine whether the income cap is exceeded "does major damage to the objectives of the Medicaid program." 4 *F.*3d at 886. Accordingly, the court concluded that "Congress intended to rely on, rather than supplant, state family property law and that imposition of the Secretary's name-on-the-check rule ... contrary to state community property law is therefore inconsistent with the Medicaid statute." *Ibid.; accord Department of Health Servs. of California v. Secretary of Health & Human Servs.,* 823 *F.*2d 323, 324 (9th Cir.1987) (reversing Secretary's disapproval of state plan proposing to use California community-property law instead of name-on-the-check rule); *Bowen, supra,* 815 *F.*2d at 557 (reversing Secretary's disapproval of state plan proposing to use Washington community-property law instead of name-on-the-check rule); *Purser, supra,* 702 *P.*2d at 1206 (requiring state Medicaid administrator to apply community-property law in determining eligibility for benefits instead of name-on-the-check rule). *But see In re Hamner,* 427 *So.*2d 1188 (La.1983) (reversing lower court

decision requiring state Medicaid agency to determine eligibility under community-property law).

The effect on Medicaid eligibility of the equitable distribution of a pension in connection with a divorce from bed and board presents another instance in which the issue of ownership of income becomes relevant. Although the federal and New Jersey regulations provide that a pension constitutes unearned income for Medicaid-eligibility purposes, *see* 20 *C.F.R.* § 416.1121(a); *N.J.A.C.* 10:71–5.4(a)3, nothing in the Medicaid statute or regulations addresses the ownership of that income. "Since the Medicaid statute or regulations provide no criteria for determining whether income in a particular form or from a particular source is the income of a particular individual, one 'must turn to state law to define the property interests involved.' " *Purser, supra,* 702 *P.*2d at 1203 (quoting *United States v. Overman,* 424 *F.*2d 1142, 1146 (9th Cir.1970)).

█ *N.J.S.A.* 2A:34–23 provides that "where a judgment of . . . divorce from bed and board is entered the court may make such award or awards to the parties . . . to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage." The general purpose of that provision is to empower courts "to allocate marital assets between the spouses, regardless of ownership." *Painter v. Painter,* 65 *N.J.* 196, 213, 320 *A.*2d 484 (1974). That a pension is considered "property subject to equitable distribution" under that statute is well settled. *Kruger v. Kruger,* 73 *N.J.* 464, 471, 375 *A.*2d 659 (1977); *see also Marx v. Marx,* 265 *N.J.Super.* 418, 425, 627 *A.*2d 691 (Ch.Div. 1993) ("Under New Jersey law, pensions are clearly subject to equitable distribution."); *Ryan v. Ryan,* 261 *N.J.Super.* 689, 695, 619 *A.*2d 692 (Ch.Div.1992) ("In New Jersey, pensions are regularly subject to equitable distribution as a form of deferred compensation."). A pension "is the result of direct or indirect efforts expended by one or both the parties to the marriage—it is additional compensation for services rendered for the employer

and a right acquired during the marriage." *Kikkert v. Kikkert,* 177 *N.J.Super.* 471, 476, 427 A.2d 76 (App.Div.), *aff'd o.b.,* 88 *N.J.* 4, 438 A.2d 317 (1981).

The purpose of equitable distribution differs from that of support obligations:

> Alimony and child support can help maintain the income of both parties at a certain level over time by using one party's income to support the other. However, the primary purpose of marital property distribution laws is not to compensate for changes in the parties' fortunes *after* they have separated, but to achieve a fair distribution of what the parties 'lawfully and beneficially acquired' while they were together.
>
> [*Kikkert, supra,* 88 *N.J.* at 9, 438 A.2d 317 (Pashman, J., concurring).]

*See also Mendell v. Mendell,* 162 *N.J.Super.* 469, 475–76, 393 A.2d 600 (App.Div.1978) (noting "that alimony is awarded to defray the expenses of supporting a spouse *post* divorce, whereas, fundamentally, equitable distribution is awarded for recognized contributions that each spouse has made toward the accumulation of property during the time span of the viable coverture").

In this case, to effectuate the equitable distribution of assets the QDRO directed the administrator of the Union Carbide pension to pay L.M.'s wife "the benefits of the plan as if she were the employee pension beneficiary." Specifically, the administrator must pay L.M.'s wife "$657.37 per month plus all increases to which the participant may have been entitled." L.M. retained no interest in the pension. Therefore, pursuant to New Jersey law, L.M.'s wife is the sole owner of the pension asset. We note that if L.M. were required to pay his wife $657.37 per month in alimony, but retained his pension through equitable distribution, he would remain the owner of the pension asset because "[t]he allowance of alimony does not confer upon the receiving spouse any interest in the assets of the paying spouse." *Mendell, supra,* 162 *N.J.Super.* at 475, 393 A.2d 600.

Because L.M. does not own the pension, we hold that the monthly pension income cannot be considered as income that is available to L.M. for Medicaid eligibility purposes. Pursuant to 42 *U.S.C.A.* § 1396a(a)(17)(D), the Secretary has promulgated "deem-

ing" rules that provide that "[e]xcept for a spouse of an individual or a parent for a child who is under age 21 or blind or disabled, the agency must not consider income and resources of any relative as available to an individual." 42 *C.F.R.* § 435.602(a)(1). Moreover, "[w]hen a couple ceases to live together, the agency must count only the income of the individual spouse in determining his or her eligibility, beginning the first month following the month the couple ceases to live together." 42 *C.F.R.* § 435.602(a)(3); *see also New Mexico, supra,* 4 *F.*3d at 885 n. 3 ("The Medicaid regulations do take up the analytically subsequent issue of when income concededly owned by an applicant's spouse may nevertheless be deemed available to the applicant, but they expressly reject any presumption of spousal support ... where institutionalization of the applicant physically separates the couple."). Because L.M. and his spouse are divorced, as well as physically separated, the pension benefits owned by L.M.'s spouse cannot under existing regulations be considered as income that is available to L.M.

Despite the deference we generally accord to an agency's interpretation of the operative law, the decision by the Director of DHS–DMAHS to attribute the pension income to L.M. after the pension was equitably distributed to his wife cannot stand. That decision is inconsistent with New Jersey's law of equitable distribution. Furthermore, the operative principles of New Jersey's family-property law do not conflict with the express terms of the Medicaid law, *see Bowen, supra,* 815 *F.*2d at 556 ("The Medicaid statute does not expressly provide for the preemption of state family property law."); nor do they inflict " 'major damage' to 'clear and substantial' federal interests" in the Medicaid program. *Hisquierdo, supra,* 439 *U.S.* at 581, 99 *S.Ct.* at 808, 59 *L.Ed.*2d at 11 (quoting *United States v. Yazell,* 382 *U.S.* 341, 352, 86 *S.Ct.* 500, 507, 15 *L.Ed.*2d 404, 410 (1966)); *cf. New Mexico, supra,* 4 *F.*3d at 886 (rejecting notion "that a state legal scheme effecting a fair and reasonable distribution of marital income between husband and wife somehow does major damage to the objectives of the Medicaid program"); *Purser, supra,* 702 *P.*2d at 1204 (holding that "the

equitable treatment of married people under community property law does no 'major damage' to the 'clear and substantial' objectives of the Medicaid law").

Through enactment of the Medicaid program, Congress intended to confer "broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Beal v. Doe*, 432 *U.S.* 438, 444, 97 *S.Ct.* 2366, 2370, 53 *L.Ed.*2d 464, 472 (1977); *see also Bowen, supra*, 815 *F.*2d at 557 (noting that Medicaid program is " 'characterized by State diversity and independence in determining eligibility, services provided, and reimbursement levels' ") (quoting *Medicaid and Nursing Home Care* at 6). Although portions of the Medicaid statute are oriented toward national uniformity because they are directed at "specific program-related ends [such] as the provision of an essential minimum of coverage and the quality and efficient utilization of care, . . . '[n]o comparable purpose exists for uniformity when determining the income ownership of an institutionalized applicant for Medicaid eligibility purposes.' " *New Mexico, supra*, 4 *F.*3d at 886 (quoting *Purser, supra*, 702 *P.*2d at 1204). Moreover, New Jersey's rule that treats pension benefits as an asset appropriate for equitable distribution during divorce proceedings cannot plausibly be regarded as inconsistent with federal Medicaid-eligibility standards: the principal application of our rule focuses on the fair division of pension assets between divorcing parties, and only incidentally affects Medicaid eligibility. Although the rule's collateral impact on Medicaid may justify regulatory action, *infra* at 500, 659 *A.*2d at 460, its predominant relationship to equitable distribution of marital assets demonstrates that the rule cannot fairly be regarded as one that frustrates the objectives of the Medicaid program.

Because the pension is owned by L.M.'s spouse, the pension benefits cannot constitute available income to L.M. under the federal and New Jersey regulations that define income.

## IV

Finally, we note the Attorney General's concern that a disposition of this appeal in a manner favorable to L.M. might encourage persons to divorce to protect assets for the spouse of the nursing-home resident. That incentive, the Attorney General points out, might persist even if the Governor's proposal to cover nursing-home services through the medically needy program becomes law because persons could seek to transfer assets such as pensions through equitable distribution instead of spending down their income on their care. That would unfairly place a further burden on the limited financial resources of the State.

We share the Attorney General's concern. We also infer that government is equally concerned about federal and state Medicaid policies that are so restrictive that they encourage married couples, like L.M. and his wife, to seek judicial authorization to sever the bonds of a fifty-three-year-old marriage that they would otherwise preserve at all costs. As noted, that cruel dilemma confronted by L.M. and his spouse has been partially alleviated by Congress's authorization of "Miller Trusts" and by the prospect of legislative approval of Governor Whitman's proposal to cover nursing-home services through the medically needy program. *Supra* at 488–489, 659 A.2d at 454. We assume that such modifications of the Medicaid eligibility requirements will make it unnecessary for families in the future to resort to the extreme steps taken by L.M. and his spouse to become Medicaid-eligible.

In that connection, we note that the Governor's budget proposal also recommends that DHS–DMAHS implement policies to prevent persons from evading the rules of the Medicaid system to avoid paying their appropriate share for long-term care. Either the Secretary or DHS–DMAHS might further that objective by considering adoption of a regulation that addresses the effect on available income of the transfer of pension benefits by equitable distribution primarily for the purpose of achieving Medicaid eligibility.

The judgment of the Appellate Division is reversed, and the matter remanded to DHS–DMAHS for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.