# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5105-18

A.M.,

      Petitioner-Appellant,

v.

MONMOUTH COUNTY BOARD
OF SOCIAL SERVICES,

      Respondent-Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **March 11, 2021**
>
> **APPELLATE DIVISION**

Submitted February 8, 2021 – Decided March 11, 2021

Before Judges Sabatino, Currier and DeAlmeida.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

Wilentz, Goldman & Spitzer, PA, attorneys for appellant (Darren M. Gelber, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

M.M.,[1] through her son and power of attorney, petitioner A.M.,[2] appeals from the June 14, 2019 final agency decision of the Acting Director, Division of Medical Assistance and Health Services (DMAHS) finding her eligible for Medicaid benefits but: (1) imposing a penalty of $496,333.33, the value of the one-third interest in her home she transferred to A.M. during the five-year "look-back period" established in N.J.A.C. 10:71-4.10; and (2) directing that the penalty be increased by the value of a life estate in the home M.M. relinquished to A.M. at the time of the transfer. A.M. argues the transfers are exempt from the penalty under the child caregiver exemption established in N.J.A.C. 10:71-4.10(d)(4). We agree and reverse.

I.

The following facts are derived from the record. At the times relevant to this appeal, M.M. was in her eighties. A.M. resided with M.M. for more than fifty years. He worked as a teacher at a nearby school.

M.M. owned the home in which she and her son lived. In August 2003, she transferred a one-third interest in the property to A.M. and a one-third

---

[1] We identify the parties by their initials to protect the confidentiality of M.M.'s medical records.

[2] During the pendency of this appeal, M.M. died. We ordered that A.M. be substituted as appellant.

interest to her daughter, C.F. M.M. retained the remaining one-third interest and a life estate in the property.

In 2008, M.M. was diagnosed with Alzheimer's disease. A.M. was M.M.'s sole caregiver from the time of her diagnosis until September 2012. In a certification, A.M. stated:

> [d]uring this time I would prepare her meals, take her to her doctor's appointments, help her dress and bathe, drive her to see family and friends, help her manage her finances, help her with her medications, walk and shop with her, do her laundry and household chores, take her to church and assist her in any way she needed.

A 2012 medical report notes that M.M.'s illness had progressed. The report indicates that her short-term memory had worsened and that she had developed incontinency. In September 2012, A.M. hired two part-time home healthcare aides to assist him in caring for M.M. when he was at work four days a week. A.M. used M.M.'s assets to pay for the aides.

During this period, A.M.'s typical day began at about 5:30 a.m., when his mother awoke and needed help getting out of bed. He assisted her with walking to the bathroom and toileting. A.M. then assisted his mother with washing, dressing, and grooming. He cooked breakfast for M.M. and watched television with her before leaving for work at approximately 10:00 a.m., when one of the aides arrived. A.M. would inform the aide of M.M.'s condition,

A-5105-18

medication schedule, and needs for the day. When he returned from work, A.M. prepared dinner for M.M. and assisted her with eating. After dinner, he cleaned his mother, assisted her with taking a shower, and administered her medications. Around 8:00 p.m., he assisted his mother into sleepwear and put her to bed. During the night, he would take care of his mother when she wandered and assist her when she needed to use the bathroom. If she had an accident, A.M. would change his mother's sheets and clothes and assist her back to bed.

As M.M.'s illness progressed, she needed further assistance. In response, A.M. rearranged his work schedule, reducing his hours from ten to twelve hours a day to six hours a day. He also declined a promotion to a supervisory position which would have required greater work hours.

On September 30, 2014, M.M. transferred her one-third interest in the house to A.M. According to the deed memorializing the transfer, it "is meant to convey [M.M.'s] interest in this property to [A.M.]" There is no express provision in the deed stating that M.M. reserved her life estate. M.M. received less than fair market value for the transfer of her interest in the property to A.M.

In October 2014, M.M. entered a long-term care facility. A medical report stated that "A.M. was his mother's primary caregiver and without him

A-5105-18

she would have had to go to an [a]ssisted [l]iving or [n]ursing [h]ome [f]acility years before she needed to go." A.M.'s tax records show that he earned $67,482 in 2012 and $66,533 in 2013, but $75,538 in 2014 and $98,814 in 2015, after his mother entered the long-term care facility.

On April 3, 2018, A.M. applied to respondent Monmouth County Board of Social Services, a county welfare agency (CWA), for Medicaid benefits for M.M. The CWA found M.M. eligible for benefits as of April 1, 2018 for ancillary services, and as of June 15, 2021 for the Medicaid program. The agency imposed an eligibility penalty of 1170 days (or $496,333.33) based on the value of the September 2014 transfer of her one-third interest in the residence to A.M. The CWA did not mention a purported transfer of M.M.'s life estate.

A.M. requested a fair hearing, arguing that the 2014 transfer of his mother's one-third interest in the property was exempt from the look-back penalty under the child caretaker exemption established in N.J.A.C. 10:71-4.10(d)(4). The matter was transferred to the Office of Administrative Law (OAL), where a hearing was held before an Administrative Law Judge (ALJ).

The ALJ heard testimony from A.M. and a representative of the CWA. On May 2, 2019, the ALJ issued an initial decision reversing the CWA's decision. The ALJ found A.M.'s testimony to be credible and supported by

5

M.M.'s medical records. The judge concluded that the assistance A.M. provided to M.M. exceeded the personal support services a child is normally expected to provide to a parent, specifically dressing, grooming, toileting, bathing, and preparing meals. In addition, the ALJ found the services A.M. provided to his mother were essential for her health and safety and that he provided those services for more than two years prior to her institutionalization. Thus, the ALJ concluded, M.M.'s 2014 transfer of her one-third interest in the residence fell within the child caregiver exemption to the look-back penalty.

The ALJ rejected the CWA's argument that A.M.'s full-time employment negated the child caregiver exemption. The judge determined that N.J.A.C. 10:71-4.10(d)(4) does not require a child to dedicate his full time to caring for a parent to qualify for the exemption. He noted that A.M. reduced his work hours to care for his mother for longer amounts of time when her needs increased.

For the first time, the CWA raised before the ALJ the argument that the penalty had been undercalculated because M.M., in addition to transferring her one-third interest in the property to A.M. in 2014, relinquished her life estate. The CWA argued that the matter should be remanded for recalculation of the penalty to include the value of the life estate.

The ALJ rejected the CWA's argument that M.M. relinquished her life estate to A.M. in 2014, concluding instead that M.M. retained a life estate in the property at that time. Thus, the ALJ decided, the CWA should recalculate the penalty to reflect the value of M.M.'s life estate in the residence, not because she transferred the asset to A.M., but because it was an asset available to M.M. at the time of her institutionalization.

A.M. filed exceptions to the ALJ's decision. On June 14, 2019, the Acting Director issued a final agency decision adopting in part and reversing in part the ALJ's initial decision. She determined that A.M. did not prove entitlement to the child caretaker exemption. While acknowledging full-time employment does not prohibit application of the exemption, the Acting Director concluded that A.M. did not prove he provided care that exceeded normal expectations for a child and delayed M.M.'s institutionalization. In addition, the Acting Director concluded A.M. did not prove that he reduced his work hours to care for M.M. and found that the aides provided care for M.M. during most of her waking hours. In addition, because A.M. paid for the aides with M.M.'s funds, the Acting Director concluded M.M. "provided for her own care in order to remain at home and out of the nursing facility." Lastly, the Acting Director found A.M. failed to prove the amounts paid for the aides or that they were compensated at fair market value. N.J.A.C. 10:71-4.10(j).

With respect to the life estate, the Acting Director, contrary to the finding of the ALJ, concluded that M.M. relinquished her life estate in the residence in the 2014 transaction. She determined that the value of the life estate must be added to the look-back penalty because M.M. did not receive fair market value for that asset. The Acting Director, therefore, affirmed the portion of the ALJ's decision concerning recalculation of the penalty, albeit for different reasons.[3]

This appeal followed. A.M. raises the following arguments for our consideration.

> POINT I
>
> THE DETERMINATIONS THAT THE 2014 DEED WAS NOT COVERED BY THE CAREGIVER EXCEPTION AND THAT [M.M.] RETAINED A LIFE ESTATE IN THE PROPERTY AT THE TIME SHE EXECUTED THE 2014 DEED WERE ARBITRARY, CAPRICIOUS, UNREASONABLE AND NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE.

---

[3] The CWA subsequently valued the life estate at $450,244, increasing the look-back penalty to $946,577.

POINT [II]

THE ISSUE OF WHETHER [M.M.] RETAINED A
LIFE ESTATE IN THE PROPERTY AT THE TIME
SHE EXECUTED THE 2014 DEED WAS NOT AN
ISSUE BEFORE THE A.L.J. OR THE DIVISION.

II.

"An administrative agency's decision will be upheld 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 349 (App. Div. 2010) (alteration in original) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006)). "[I]f substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992).

Nevertheless, if our review of the record shows that the agency's finding is clearly mistaken, the decision is not entitled to judicial deference. H.K. v.

9

Dep't of Human Servs., 184 N.J 367, 386 (2005); L.M. v. State, Div. of Med. Assistance & Health Servs., 140 N.J. 480, 490 (1995). Moreover, where an agency rejects an ALJ's findings of fact, we need not give the agency the deference we ordinarily accord on review of final agency decisions. H.K., 184 N.J. at 384.

"Medicaid is a federally-created, state-implemented program that provides 'medical assistance to the poor at the expense of the public.'" In re Est. of Brown, 448 N.J. Super. 252, 256 (App. Div. 2017) (quoting Est. of DeMartino v. Div. of Med. Assistance & Health Servs., 373 N.J. Super. 210, 217 (App. Div. 2004)); see also 42 U.S.C.A. § 1396-1. To receive federal funding the State must comply with all federal statutes and regulations. Harris v. McRae, 448 U.S. 297, 301 (1980).

Pursuant to the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5, DMAHS is responsible for administering the Medicaid program in our State. Through its regulations, DMAHS establishes "policy and procedures for the application process[.]" N.J.A.C. 10:71-2.2(b). "[T]o be financially eligible, the applicant must meet both income and resource standards." Brown, 448 N.J. Super. at 257; see also N.J.A.C. 10:71-3.15; N.J.A.C. 10:71-1.2(a).

Because Medicaid funds are limited, only those applicants with income and non-exempt resources below specified levels may qualify for government-paid assistance. Resources are defined "as any real or personal property which is owned by the applicant . . . and which could be converted to cash to be used for his or her support and maintenance." N.J.A.C. 10:71-4.1(b).

An applicant who transfers or disposes of resources for less than fair market value during a sixty-month look-back period before the individual becomes institutionalized or applies for Medicaid is penalized for making the transfer. 42 U.S.C.A. § 1396p(c)(1)(E); N.J.A.C. 10:71-4.10(m)(1). Transfers within the look-back period are presumed to be made to obtain earlier Medicaid eligibility than that to which the applicant would otherwise be entitled. N.J.A.C. 10:71-4.10(i). The presumption may be rebutted with "convincing evidence that the assets were transferred exclusively (that is, solely) for some other purpose." N.J.A.C. 10:71-4.10(j). If the applicant does not overcome the presumption, a transfer penalty denies Medicaid benefits during the period the applicant should have been using the transferred resources for medical care. See W.T. v. Div. of Med. Assistance & Health Servs., 391 N.J. Super. 25, 37 (App. Div. 2007).

If the applicant transfers any resource within the look-back period, the transfer is reviewed, and the resource's fair market value is ascertained, as is

11

the consideration received for the transferred resource. N.J.A.C. 10:71-4.10(c). The difference between the fair market value of the resource and the compensation received by the applicant is the "uncompensated value." N.J.A.C. 10:71-4.10(c)(2). If the uncompensated value of the transferred resources, combined with other countable resources, exceeds the resource limit for Medicaid eligibility, a transfer penalty is assessed. N.J.A.C. 10:71-4.10(m)(1).

An exception to the transfer penalty applies when an applicant transfers her interest in her home to her child under certain circumstances. The exception is established in N.J.A.C. 10:71-4.10(d)(4), which provides:

> (d) [A]n individual shall not be ineligible for an institutional level of care because of the transfer of his or her equity interest in a home which serves (or served immediately prior to entry into institutional care) as the individual's principal place of residence and the title to the home was transferred to:
>
> . . . .
>
> 4. A son or daughter of the institutionalized individual . . . who was residing in the individual's home for a period of at least two years immediately before the date the individual becomes an institutionalized individual and who has provided care to such individual which permitted the individual to reside at home rather than in an institution or facility.
>
> i. The care provided by the individual's son or daughter for the purposes of this subchapter shall have exceeded normal personal support activities (for

example, routine transportation and shopping). The individual's physical or mental condition shall have been such as to require special attention and care. The care provided by the son or daughter shall have been essential to the health and safety of the individual and shall have consisted of activities such as, but not limited to, supervision of medication, monitoring of nutritional status, and insuring the safety of the individual.

The regulation reflects the language of a federal statute, 42 U.S.C.A. § 1396p(c)(2)(A)(iv), the intent of which is to provide relief where a child provided care for two years that prevented the institutionalization of a parent. The applicant bears the burden of establishing entitlement to the exemption.

Having carefully reviewed the record in light of applicable legal standards, we conclude the Acting Director misapplied N.J.A.C. 10:71-4.10(d)(4) to the facts.

There is no dispute that A.M. was M.M.'s child and that he lived in the house that was the subject of the transfer for at least two years immediately preceding M.M.'s institutionalization. Nor does the Acting Director dispute that M.M. had a medical condition requiring special attention or care.

At issue is the Acting Director's determination that A.M. failed to prove that he provided care to M.M. that "exceeded normal personal support activities" and which "permitted [M.M.] to reside at home rather than in an

13

institution or facility." The Acting Director relied on a number of conclusions to support this determination.

First, the Acting Director, while acknowledging that N.J.A.C. 10:71-4.10(d)(4) does not require a child caregiver to not be employed outside the home to qualify for the exemption, found that A.M. failed to prove that he significantly reduced his hours at work and pay to care for M.M. The regulation, however, does not place a limit on the number of hours a child may work outside the home or the amount of income the child may earn in order to fall within the exemption. It is silent with respect to the child's employment and income.

In addition, the intent of the regulation – to encourage children to make the necessary arrangements to care for a parent in their home to avoid the public expense of institutionalization – would not be furthered by a requirement that the child caregiver work only a limited number of hours outside the home or earn no more than a particular income. To the contrary, to the extent that a child can both provide for the care of a parent in her home and provide a source of income for the family through outside employment, the purpose of the regulation is furthered. A child who earns money outside the

14

home may well be more likely to afford the expenses associated with the at-home care of a parent who would otherwise be institutionalized.[4]

Second, the Acting Director determined that A.M. did not prove that he provided a level of care to M.M. beyond that normally expected from a child and which delayed her institutionalization. However, there is ample undisputed evidence in the record to the contrary. A.M. attended to all of the tasks necessary to wake, feed, clean, medicate, and dress his mother in the mornings before he left for work. He fed, bathed, clothed, medicated, and put his mother to bed after he returned from work. He also monitored M.M. during the overnight hours, a significant responsibility, given that M.M. sometimes wandered and soiled the bed, requiring further bathing, dressing, and a change of sheets. A medical report in the record states that A.M. was his mother's primary caregiver and that without his assistance she would have been institutionalized years earlier than she was. In light of this overwhelming evidence, we conclude it was unreasonable for the Acting Director to find that A.M. did not establish that the care he provided to M.M. fell within the regulation.

---

[4] We note A.M.'s income increased in the years after M.M. was institutionalized, suggesting his employment was curtailed while he was caring for M.M.

A-5105-18

Nor do we find support in N.J.A.C. 10:71-4.10(d)(4) for the Acting Director's conclusion that the exemption does not apply when a child arranges for home healthcare aides to assist in providing care to a parent. Nothing in the regulation requires the child to be the sole caregiver to a parent to qualify for the exemption. It is instead the extent of the assistance provided by the child that is relevant. In her decision, the Acting Director asked, in light of the extensive personal services A.M. provided to his mother before and after work, and the number of hours M.M. slept, "what services were the aides paid . . . to perform?" The question both contradicts the Acting Director's finding that A.M. failed to prove that he provided non-expected services to M.M. before and after work and overlooks evidence in the record regarding M.M.'s need for overnight assistance. A.M.'s testimony and medical records indicate that M.M. wandered during the night, requiring A.M.'s intervention for her safety, and sometimes soiled her bed, requiring further assistance from A.M. The aides provided necessary assistance and monitoring of M.M. in the comparatively few hours per week that A.M. was not directly caring for his mother to allow him to maintain his employment and a source of income for the household.

We also find no support in the regulation for the Acting Director's conclusion that the source of the funds used to pay for the home healthcare aides has legal import. It is undisputed that A.M. paid for the aides with

16

M.M.'s funds. The regulation does not, however, require that the child caregiver finance all of the care provided to a parent to qualify for the exemption. A.M. arranged for the aides to assist his mother while he was at work. He was responsible for ensuring daily coverage, instructed the aides each morning on his mother's condition, scheduled medication, and needs, and relieved them when he returned home. A.M. arranged for and oversaw the care the aides provided to M.M., whose condition made it impossible for her to perform those tasks for herself.

Because the Assistant Director erred in her application of N.J.A.C. 10:71-4.10(d)(4), we reverse her determination that A.M. is not entitled to the child caregiver exemption for any assets transferred to him by M.M. in the 2014 deed.

There is ample support in the record for the Assistant Director's determination that M.M. relinquished her life estate in the property in the 2014 deed. A.M. does not dispute this finding. This interest in the home, B.D. v. Div. of Med. Assistance & Health Servs., 397 N.J. Super. 384, 392 (App. Div. 2007), also falls within the child caregiver exemption.[5]

---

[5] In light of our determination that N.J.A.C. 10:71-4.10(d)(4) precludes imposition of a look-back penalty, we need not decide A.M.'s due process arguments.

The June 14, 2019 final agency decision of the Acting Director is reversed to the extent that it imposes a look-back penalty on M.M. The agency is directed to take appropriate steps to implement our determination promptly and no later than forty-five days from the date of this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION