878 A.2d 16 (2005)
379 N.J. Super. 321
H.K., Petitioner-Appellant,
v.
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES and Cape May County Board of Social Services, Respondents-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted June 1, 2005.
Decided July 29, 2005.
Nancy M. Rice, Haddonfield, attorney for appellant (Ms. Rice, Grayson H. Heberley *17 and Tina DiDomenico Angeloni, on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Caitlin L. Aviss, Deputy Attorney General, on the brief).
Before Judges WECKER, S.L. REISNER and SELTZER.
The opinion of the court was delivered by
S.L. REISNER, J.A.D.
This case concerns the continuing tension between the State's effort to conserve Medicaid resources for the truly needy and the legal ability of institutionalized Medicaid recipients to shelter income for the benefit of their non-institutionalized spouses. In this case, we hold that the applicant and his wife transgressed the permissible limits of Medicaid planning by entering into a divorce from bed and board[1] and agreeing, in a consent order entered without judicial fact finding, that the institutionalized husband's pension benefits would be paid to the wife as alimony.

I
The facts in this case were largely stipulated. The husband, H.K., suffered a debilitating stroke and was admitted to a nursing home in May 2002. H.K. initially applied for Medicaid, under the "medically needy" nursing home program, in May 2002, but could not qualify until he and his wife, R.K., had "spent down" their available resources to the limit that would qualify H.K. for Medicaid. See N.J.A.C. 10:71-4.8; H.K. v. Div. of Med. Assistance & Health Servs., 184 N.J. 367, 380-82, 877 A.2d 1218, 1226-27 (2005); Estate of F.K. v. Div. Med. Assistance & Health Servs., 374 N.J.Super. 126, 134-35, 863 A.2d1065 (App.Div.), certif. denied, 184 N.J. 209, 876 A.2d 283 (2005). They reached that limit in August of 2002.
H.K. was able to qualify for medically needy nursing home Medicaid even though he had Social Security and pension income of approximately $4,500 per month and his wife worked full-time and earned over $2,000 per month. However, H.K. was required to use his pension and Social Security benefits to pay part of the cost of his nursing home care. See N.J.A.C. 10:70-4.1 and -6.1. Medicaid would pay for the balance of the nursing home costs. See L.M. v. Div. of Med. Assistance & Health Servs., 140 N.J. 480, 486-88, 659 A.2d 450 (1995).[2]
The Federal Medicaid statute, 42 U.S.C.A. § 1396r-5(d), and our State's implementing regulations, N.J.A.C. 10:71-5.7(c), recognize that some portion of an institutionalized spouse's income may be used to support the community spouse to avoid the latter from becoming impoverished. *18 See Wisconsin Dep't of Health and Family Servs. v. Blumer, 534 U.S. 473, 480, 122 S.Ct. 962, 968, 151 L.Ed.2d 935 (2002) ("Congress sought to protect community spouses from `pauperization' while preventing financially secure couples from obtaining Medicaid assistance."). But those same provisions place strict limits on the amount of a Medicaid recipient's income that can be used for the community spouse allowance. Id. at 481-82, 122 S.Ct. at 965. At the time H.K. qualified for Medicaid, the spousal allowance was normally limited to $1,493. See N.J.A.C. 10:71-5.7(c); Division of Medical Assistance and Health Services Medicaid Communication No. 02-17 (July 5, 2002). A community spouse may obtain a larger allowance by demonstrating, at an administrative hearing, that he or she suffers "exceptional circumstances resulting in financial duress." N.J.A.C. 10:71-5.7(e). See 42 U.S.C.A. § 1396r-5(e). A separate provision, N.J.A.C. 10:71-5.7(f), permits an alternative means of obtaining support for the community spouse:
If a court has entered an order against an institutionalized spouse for monthly income for the support of a community spouse and the amount of the order is greater than the amount of the community spouse deduction, the amount so ordered shall be used in place of the community spouse deduction.
This regulation implements an analogous provision in the federal Medicaid statute, 42 U.S.C.A. § 1396r-5(d)(5).[3]
R.K.'s monthly income was too high to entitle her to a community spousal allowance under N.J.A.C. 10:71-5.7(c). Therefore, unless R.K. qualified for an exception to the cap set by section 5.7(c), H.K.'s entire income would be used to pay for his nursing home care.
H.K. and R.K. attempted to invoke the "court order" exception of N.J.A.C. 10:71-5.7(f), by obtaining a divorce from "bed and board" with a property settlement agreement providing for support to be paid to R.K. from H.K.'s pension.[4] The divorce action was filed in October 2002 and was finalized by consent on December 24, 2002. The Final Judgment of Divorce From Bed and Board specifically recited that the property settlement agreement, incorporated in the judgment, was entered without the court having taken testimony "as to the merits thereof, and therefore [the court] makes no judgment with respect to the fairness thereof." Based on this final judgment, H.K. sought recalculation of H.K.'s Medicaid benefit, claiming that the court order for her support superceded the cap on the spousal *19 allowance. But on March 20, 2003, the Board declined to recognize H.K.'s support obligation to R.K. as a deduction for Medicaid purposes.
H.K. appealed that determination at a hearing before the Office of Administrative Law (OAL), claiming that N.J.A.C. 10:71-5.7(f) required the Board to recognize and include his court-ordered spousal support obligation in calculating his income for Medicaid purposes.
Administrative Law Judge Todd Miller rejected H.K.'s contention in an initial decision on February 10, 2004. He reasoned that a literal reading of the regulation would lead to an absurd result, allowing Medicaid applicants to transfer additional income to their spouses without a showing of exceptional circumstances and financial duress, which the Medicaid statute and regulations would otherwise require. 42 U.S.C.A. § 1396r-5(e)(2)(B); see N.J.A.C. 10:71-5.7(e). He concluded that "the evidence in this case did not involve financial duress or exceptional circumstances. Rather, it came about through crafty planning by combining an old divorce statute with a regulation intended to offer relief to those in financial need. . . . [A] substitute maintenance deduction is not presently necessary to alleviate financial duress."
The State Division of Medical Assistance and Health Services (DMAHS) adopted the Initial Decision in a final determination dated May 17, 2004. The DMAHS decision reasoned that giving effect to the divorce judgment "would be contrary to the purpose and intent of the Medicare Catastrophic Coverage Act" which was intended to avoid pauperization of the community spouse by assuring that she would be allowed "sufficient" but "not excessive" income. The agency also noted that "the support payment was not evaluated on the merits by the Superior Court Judge" and "[t]hus, at no time did the court make a finding that the property settlement was equitable." The agency concluded:
Moreover, New Jersey courts have opined that a property "agreement which would leave a spouse a public charge or close to it". . . would probably not be enforced by any court.
Courts in other states have directly addressed the issue of using a divorce proceeding to accelerate Medicaid and have held that relieving one spouse from all responsibility for spousal maintenance in order to force the other spouse into poverty and shift the responsibility to Medicaid violates public policy in general and the underlying policy of the Medicaid Act.

II
In passing upon the decision of an administrative agency, our scope of review is limited:
Though sometimes subsumed in the search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
[Public Serv. Elec. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103, 501 A.2d 125 (1985) (citations omitted).]
We are also mindful that [a]n agency's interpretation of its own regulations is entitled to substantial deference. DiMaria v. Bd. of Trs. of Pub. Employees' Ret. Sys., 225 N.J.Super. 341, 351, 542 A.2d 498 *20 (App.Div.), certif. denied, 113 N.J. 638, 552 A.2d 164 (1988).
We are satisfied that, given the facts of this case, the agency's decision is consistent with the language and purpose of the Medicaid statute. 42 U.S.C.A. § 1396r-5(d)(5). Accepting H.K.'s contentions would allow Medicaid recipients and their spouses to enter into collusive support agreements for the sole purpose of diverting the Medicaid recipient's income to the community spouse. We have previously disapproved such potentially unlimited transfers of income from an institutionalized spouse to the community spouse, in Estate of G.E. v. Div. of Med. Assistance & Health Servs., 271 N.J.Super. 229, 239, 638 A.2d 833 (App.Div.1994). That case concerned a community spouse who had obtained a qualified domestic relations order (QDRO) so that the income from her husband's pension could be used for her support. We affirmed the agency's determination that the amounts payable under the QDRO were not to be excluded from the calculation of the institutionalized husband's available income for purposes of N.J.A.C. 10:71-5.1.
H.K. contends, in essence, that the alternative provision of N.J.A.C. 10:71-5.7(f), permits a community spouse to obtain an unlimited increase in the spousal allowance by obtaining a court order for support. But accepting H.K.'s position would nullify the statutory and regulatory limitations on the community spouse allowance. We will not construe a statute or a regulation in a manner that produces an absurd result or that renders a part of it meaningless. See Paper Mill Playhouse v. Millburn Township, 95 N.J. 503, 521, 472 A.2d 517 (1984); Simpkins v. Saiani, 356 N.J.Super. 26, 36, 811 A.2d 474 (App.Div.2002).
The 1988 amendments to the Federal Medicaid statute, which created the community spousal allowance, were intended to prevent community spouses from becoming impoverished. Congress recognized that, particularly for women who had been homemakers, and who relied on their husbands' pensions for support in their old age, the requirement that the husbands' entire income be used to pay nursing home bills represented an economic catastrophe. H.R. Rep. No. 100-105(II), at 65 (1987), reprinted in 1988 U.S.C.C.A.N. 857, at 888 (1987). Congress recognized that under the existing Medicaid law, some community spouses were forced, in desperation, to sue their institutionalized spouses for support. Id. at 69, 1988 U.S.C.C.A.N. at 892. The amendments were designed to avoid that need, by allowing some portion of the institutionalized spouse's pension or other income to be used to support the community spouse. Ibid.
In that context, Congress also recognized that under "special circumstances," a court order for support might supercede the normal community spouse allowance:
Court ordered support.  The Committee recognizes that there will be some instances in which the rules set forth in the bill do not take adequate account of the special circumstances affecting a particular community spouse. The bill therefore provides that, if a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the community spouse monthly income allowance must be at least as great as the amount of the income ordered to be paid.
[Id. at 72, 1988 U.S.C.C.A.N. at 895-96 (emphasis added).]
Nothing in the legislative history suggests that Congress would have intended the "court order" exception to apply to H.K. and R.K.'s property settlement agreement. This is not a situation where a *21 court has held an evidentiary proceeding and determined independently that the community spouse is in need of support or that she has "special circumstances." Nor was the court that entered the order even notified that H.K. was receiving Medicaid benefits. This is also not a case where there was an existing support obligation that pre-dated the Medicaid application and was entered at a time when such an application was not anticipated. Rather, the property settlement agreement in this case was an undisguised attempt to circumvent the Medicaid regulations concerning the appropriate level of the spousal allowance. Compare H.K., supra, 184 N.J. at 383-87, 877 A.2d at 1228-30 (transfer of Medicaid applicant's home forty-five months prior to her Medicaid application raises no presumption of an improper effort to qualify for Medicaid).
We do not address the issue of whether a section (f) allowance is only permitted on a showing of exceptional circumstances, which is the standard under subsection (e) for obtaining an increase in the community spouse allowance. H.K. and R.K. made no effort in this case to prove exceptional circumstances, and we deem it injudicious to address such an important issue without a proper factual record. The applicants here relied on an asserted absolute entitlement to the deduction under the literal terms of the regulation, N.J.A.C. 10:71-5.7(f), a position the agency correctly rejected.
Further, although the undisputed purpose of the limited divorce proceeding was to affect H.K.'s Medicaid benefit, the State Medicaid program was not served with the complaint or otherwise given notice of the proceeding. As a result, the proceeding was not genuinely adversarial, no factual record was made to support the alimony award, and the court that entered the order did not determine whether the award was justified in light of the countervailing interests of the State in having H.K. use his income to pay for his nursing home care.
Finally, we note that the issue in this case was, to some extent, foreshadowed in the Supreme Court's decision in L.M. v. Div. of Med. Assistance & Health Servs., 140 N.J. 480, 659 A.2d 450 (1995). The L.M. case was decided before the State amended its Medicaid statute to cover "medically needy" applicants such as H.K. In L.M., an elderly couple, married for fifty-three years, obtained a divorce from bed and board and agreed to equitable distribution to the wife of the husband's entire pension through a QDRO. Id. at 482-83, 659 A.2d 450. Distinguishing G.E., where only income from the husband's pension was transferred to the wife, the Court held that since L.M.'s entire pension had been transferred to the wife, it was no longer the husband's asset and the income from the pension was no longer attributable to the husband. Id. at 497-98, 659 A.2d 450. Therefore, under the then existing income-based test, he qualified for Medicaid. We do not find L.M. controlling here because L.M. preceded our State's adoption of the medically needy nursing home program, and unlike this case, the record in L.M. apparently established that the wife was elderly, impoverished, and clearly in need of support.
But we find L.M. relevant to our decision. In ruling for the wife, the Court recognized that its decision potentially opened the door to abusive practices, and strongly suggested that the State adopt regulations to prevent collusive transfers of assets. The Court's language is pertinent here:
Finally, we note the Attorney General's concern that a disposition of this appeal in a manner favorable to L.M. might encourage persons to divorce to protect assets for the spouse of the *22 nursing-home resident. That incentive, the Attorney General points out, might persist even if the Governor's proposal to cover nursing-home services through the medically needy program becomes law because persons could seek to transfer assets such as pensions through equitable distribution instead of spending down their income on their care. That would unfairly place a further burden on the limited financial resources of the State.
. . . .
In that connection, we note that the Governor's budget proposal also recommends that DHS-DMAHS implement policies to prevent persons from evading the rules of the Medicaid system to avoid paying their appropriate share for long-term care. Either the Secretary or DHS-DMAHS might further that objective by considering adoption of a regulation that addresses the effect on available income of the transfer of pension benefits by equitable distribution.
[Id. at 500, 659 A.2d 450.]
It is now ten years since L.M. was decided. The State has adopted the "medically needy" nursing home program. But the State has not adopted regulations giving content to the very general language of 42 U.S.C.A. § 1396r-5(d)(5) and N.J.A.C. 10:71-5.7(f). Given the importance of clear guidelines to assist families in Medicaid planning, we add to the L.M. Court's language our own suggestion that regulations be adopted to address the appropriate balance between legitimate provisions for division of property and income in cases of divorce, and protection of the intended purpose of the medically needy nursing home program.
Affirmed.
NOTES
[1] Also known as a "limited divorce," a divorce from bed and board does not dissolve the marriage; it formalizes the couple's arrangement to live separately and requires one spouse to pay for the other spouse's separate living expenses. N.J.S.A. 2A:34-3; see Weinkrantz v. Weinkrantz, 129 N.J.Super. 28, 32-33, 322 A.2d 184 (App.Div.1974). As a result of the divorce from bed and board, H.K.'s wife remained a "community spouse" for Medicaid purposes. See N.J.A.C. 10:71-5.7(c).
[2] As explained in the legislative history of the Medicare Catastrophic Coverage Act of 1988, Pub.L. No. 100-360, 102 Stat. 683 (1988), after certain deductions are applied, the institutionalized spouse's entire "income is applied to the cost of nursing home care. The remainder is paid by the State and Federal governments through Medicaid." H.R. Rep. No. 100-105(II), at 66 (1987), reprinted in 1988 U.S.C.C.A.N. 857, at 899 (1987).
[3] The federal statute provides that "If a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the community spouse monthly income allowance for the spouse shall be not less than the amount of the monthly income so ordered." 42 U.S.C.A. § 1396r-5(d)(5).
[4] The parties agreed that the purpose of the "bed and board" divorce (as opposed to a divorce from the bonds of matrimony) between H.K. and R.K., was to avoid having the payments from H.K. to R.K. treated as "alimony" for Medicaid purposes. At the hearing before the OAL, the parties agreed that ordinary alimony, resulting from a divorce from the bonds of matrimony, cannot be deducted from the calculation of a Medicaid applicant's income in determining what amount of his income must be paid to the nursing home before Medicaid will pay the balance. We do not address that issue, because it is not properly before us, and it affects the rights of H.K.'s first wife, who is not a party to this case. We note that H.K.'s first wife, who is eighty-one years old and appears to be genuinely impoverished, sent the Board of Social Services a letter protesting the disallowance of H.K.'s monthly alimony payment to her, an obligation set by court order in 1976.