916 A.2d 1066 (2007)
391 N.J. Super. 25
W.T., Petitioner-Appellant,
v.
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, Respondent-Respondent, and
Ocean County Board of Social Services, Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted June 6, 2006.
Decided March 1, 2007.
*1068 Fink, Rosner, Ershow-Levenberg, attorneys for appellant (Eugene Rosner, Clark, of counsel and on the brief).
Zulima V. Farber, Attorney General, attorney for respondent Division of Medical Assistance and Health Services (Michael J. Haas, Assistant Attorney General, of counsel; Caitlin L. Aviss, Deputy Attorney General, on the brief).
Before Judges COBURN, COLLESTER and S.L. REISNER.
The opinion of the court was delivered by
COLLESTER, J.A.D.
This case involves the effect of an unequal distribution of marital assets between spouses under a property settlement agreement (PSA) incorporated into a judgment of divorce on an institutionalized applicant's qualification for Medicaid benefits. The appeal is taken from the final administrative decision of the New Jersey Department of Human Services Division of Medical Assistance and Health Services (DMAHS) upholding the assessment by the Ocean County Board of Social Services (OCBSS) of a penalty delaying the effective date of W.T.'s participation in the Medicaid program. The twenty-two month delay was applied because of his acceptance of an unequal division of marital assets in the PSA within three years of his Medicaid application.[1]
The facts are undisputed. W.T. and M.T. were married on June 9, 1962, and raised two children. W.T. was an accountant and the primary source of income for the family. In 1998 he was earning a salary of $85,000 as a manager for AT & T. He elected to retire at age fifty-eight by accepting an early retirement buyout package amounting to more than $450,000, much of which he invested in an IRA. In retirement he worked part-time for H & R Block during tax season while M.T., then age fifty-six, worked as a manager in the food service industry with an annual salary of approximately $35,000. At the time of divorce, both children were emancipated. M.T. and W.T. sold their home realizing a net profit of about $130,000 and planned to use the proceeds to purchase another home.
On December 21, 1999, W.T. received the first of a planned series of epidural injections recommended to alleviate his chronic neck and shoulder pain. Within hours, terrible things began to happen. The following morning he was unable to walk. He was rushed to the hospital and placed in intensive care, but the paralysis spread upward. By the following day W.T. was a permanent quadriplegic, breathing only with the aid of a respirator. His prognosis was grave.
*1069 After eleven weeks in the hospital, W.T. was taken to a nursing home for rehabilitation. After he was discharged in June 2000, M.T. quit her job to devote herself to his full-time care. However, within a short time he became very ill and was returned to the hospital where he remained in a coma for two weeks. After he regained consciousness, W.T. discussed with M.T. his need for constant nursing care, and they agreed to search for a suitable nursing home. Shortly thereafter, he became a resident of the Barnegat Nursing Home in Ocean County where it was clear he would reside for the rest of his life.
Since W.T. accepted an early retirement buyout, he received no pension from AT & T.M.T. was sixty, unemployed, and not yet eligible for social security benefits. Aside from modest return from bank deposits, their only income was W.T.'s monthly social security payment of $1,600. M.T. and W.T. retained an attorney and filed a medical malpractice action against the surgeon, the hospital, and the anesthesiologist. They were told that it would likely be years before they received any settlement or recovery; the suit had not been resolved as of the time of this appeal.
In May 2002, fifteen months after W.T. entered Barnegat Nursing Home, M.T. met with Susan Goldring, Esq., an attorney specializing in family law, estate planning, and elder law, to discuss concerns about her financial future. One of the options discussed was a divorce from bed and board, which decrees a judicial separation without severing the marital bond and affords each party the same property rights as an absolute divorce. See L.M. v. Div. of Med. Assistance and Health Servs., 140 N.J. 480, 659 A.2d 450 (1995); Weinkrantz v. Weinkrantz, 129 N.J.Super. 28, 32-33, 322 A.2d 184 (App.Div.1974); Loechner v. Loechner, 119 N.J.Super. 444, 292 A.2d 41 (Ch.Div.1972); 1 Gary N. Skoloff & Lawrence J. Cutler, New Jersey Family Law Practice, § 2.6 (12th ed.2006). M.T. selected this option which accommodated her beliefs as a Catholic.
Ms. Goldring told M.T. that W.T. should have independent counsel, and she followed up with a letter to W.T. making that suggestion. After W.T. retained his own attorney, the parties and their attorneys met three or four times at the Barnegat Nursing Home to draft terms for a PSA. Ms. Goldring's position on behalf of M.T. was that in a marriage of this length where W.T. was the primary income earner, M.T. would be entitled to alimony and at least an equal division of marital property. In lieu of alimony, she sought an additional amount of joint assets sufficient to carry M.T. through the time before she received social security benefits and to provide a source of support to meet some of her needs over her twenty to twenty-five year life expectancy. In contrast, W.T.'s needs were tied to his nursing home care, and his life expectancy was severely limited and incalculable due to his respiratory dependence and grave condition. Moreover, Ms. Goldring noted there were different tax consequences on distributions from the marital estate. W.T.'s medical and nursing home expenses would far exceed any drawdown from assets so that any distribution he received would be tax-free. On the other hand, any share received by M.T. would suffer a tax reduction of seventeen percent.
The PSA was prepared by W.T.'s attorney and signed by M.T. and W.T. on November 4, 2002, the same day as their divorce hearing. The PSA stated that each party waived alimony and set forth a plan of equitable distribution with the following stated purpose:
The said plan is to provide the Wife with sufficient income, which together with Social Security benefits she will receive *1070 when she attains the age necessary to qualify for same, will permit her to support herself and compensate for the loss of the Husband's income and not jeopardize the Husband's eligibility for Medicaid benefits.
The marital assets from investment accounts, IRA accounts, and bank accounts totaled about $686,000, much of which was in W.T.'s IRA account. The PSA equitable distribution plan provided for M.T. to receive assets valued at approximately $436,000, amounting to sixty-three percent of the marital estate, with W.T. to receive the remainder of about $250,000. Any recovery from the malpractice case was to be equally divided.
At the hearing, M.T. testified as to the cause of action, which was eighteen months separation or "no fault," and to her acceptance of the agreement. While W.T. was not present in court, the judge accepted the representations made by W.T.'s attorney that W.T. understood the terms of the PSA and accepted them as fair and reasonable. The trial judge granted the relief sought by M.T. and directed that the PSA be incorporated into the judgment. The signed judgment specified that the court made no independent findings as to the terms of the PSA.
Sixteen months later, on March 23, 2004, the petition for Medicaid benefits was filed. The $250,000 W.T. received in equitable distribution under the PSA had been reduced by payments for nursing home care, creation of a special needs trust, and gifts to W.T.'s daughter. The OCBSS reviewed his application and found that W.T. was then eligible for Medicaid benefits. However, the OCBSS imposed a transfer penalty under N.J.A.C. 10:71-4.10(b), finding that distribution of marital assets to M.T. under the PSA constituted an impermissible transfer for less than full value within the three-year "look back period." See N.J.A.C. 10:71-4.10(a); N.J.A.C. 10:71-4.10(b)(9). The penalty postponed W.T.'s eligibility from March 2004, when the application was filed, until September 2004. See N.J.A.C. 10:71-4.10(b).
The administrative appeal was filed as to the penalty imposed respecting assets transferred to W.T. through equitable distribution. A hearing was granted. W.T. died on January 4, 2005, but the hearing proceeded before an administrative law judge (ALJ) in May 2005. M.T. and her attorney, Susan Goldring, both testified that the PSA distribution to M.T. of more than fifty percent of the marital estate was not intended to rid W.T. of assets to assist for Medicaid qualification, but to preserve assets that were necessary for her support. Under questioning by the ALJ, Ms. Goldring explained:
We factored [the tax consequences to M.T. and W.T.] in and came up with the uneven split that we did that we felt would provide her with sufficient money to at least carry her for two years and at that point again we thought she would be able to get Social Security, and we hoped that the malpractice action would be resolved, and there would be money coming in from that.
* * *
I feel very confident that had we spent the money going to a trial that I could easily have gotten a disproportionate distribution. Whether it would have been exactly the same as we did it, or whether it would have been something different, that I cannot say.
ALJ: Is that considering his circumstances of being in a nursing home, or is this considering his  is that assuming he was not in a nursing home?
THE WITNESS: No, it would be considering that he is in a nursing home, and that his situation is fixed and not going to change at all, whereas hers is *1071 not fixed, and under normal circumstances, I didn't look it up, but I think at sixty she probably had a twenty-five-year life expectancy easily, and was going to have to have the funds one way or another to live out that life expectancy without any help from him, because it was clear that his money was going to be used up in the nursing home.
* * *
ALJ: . . . [M]y question really is though, in the negotiations, in other words, all his assets weren't taken away and everything sheltered from Medicaid, it was just Medicaid and medical needs were given consideration, and he was allocated $250,000 at least for purposes in this property settlement agreement. THE WITNESS: Correct. And given  under the totality of the circumstances, nobody has a crystal ball, but clearly under his circumstances we were  at the point that we were doing this he was trach dependent, respirator dependent, and having all sorts of other problems. We had no idea how long he was going to live, but I don't think anyone anticipated anything like a normal life expectancy.
ALJ: . . . [A]s an added amount available to him would be the med malpractice case.
THE WITNESS: Correct.
Nancy Faulkner, a Human Services Specialist with OCBSS, testified at the hearing that the transfer penalty was imposed on the PSA division because of the policy of DMAHS that any distribution of marital assets to a petitioner's spouse of more than fifty percent constituted a transfer for less than fair value. If made during the look back period, the transfer would trigger the penalty, regardless of whether a judgment of divorce incorporated an agreement to that effect. Ms. Faulkner acknowledged that the policy was not codified or contained in any regulation or written policy statement but was an oral policy reflected in minutes of a DMAHS staff meeting.
The ALJ issued his written decision on May 17, 2005. He accepted as credible the testimony of M.T. and Ms. Goldring that the rationale of the PSA division of assets through equitable distribution was independent of Medicaid eligibility requirements. Rather, the division was intended to reflect the fact that more assets would be needed by M.T. to derive net cash flow to form a sufficient amount to meet her future needs over her greater life expectancy and compensate for the federal tax of fifteen percent and the state tax of two percent which would be imposed on her when assets were drawn from W.T.'s IRA.
Commenting on the explanation given by Ms. Faulkner for OCBSS's decision imposing a transfer penalty on the amount of equitable distribution to M.T. in excess of fifty percent, the ALJ wrote:
According to [Ms. Faulkner], Medicaid recognizes matrimonial property settlements arrived at during a divorce. However, the [DMAHS] policy is that any distribution which exceeds a 50-50 distribution, is as a matter of fact a transfer for less than fair value. In essence, the [DMAHS] presumed all property settlements that exceed a 50-50 split are made for less than fair value. And, if the property distribution is considered to be for less than fair value, it is subject to the penalty period if the transfer occurred within the 36 month look back period. Notably, this is not codified in any regulation or written policy. Rather it emanates from office discussions, meetings and work sessions. It is only a document in interoffice work session minutes, according to the witness.

*1072 * * *
Here the matrimonial statute clearly speaks to the issue presented. N.J.S.A. 2A:34-23.1. Moreover, petitioner relied upon and followed the matrimonial statute. If the statute speaks clearly "to the precise question at issue," the courts "must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843, 104 S.Ct. 2778, 81 L.Ed.2d [694] (1984). On the contrary, the Medicaid regulations are silent in terms of ownership and how to calculate the fair value of assets distributed in a matrimonial settlement. The methodology employed by petitioner to arrive at the allocation of assets is embodied in N.J.S.A. 2A:34-23.1. There is no comparable Medicaid-equitable distribution regulation that holds an asset allocation exceeding a 50-50 is a transfer without fair value. The [DMAHS] policy directly conflicts with N.J.S.A. 2A:34-23.1. Furthermore, there were no reliable or quantitative proofs offered by the [DMAHS] refuting the methodology used by petitioner, notwithstanding the absence of a regulation or statute. There was no analysis of tax consequences, valuation of the marital services or relationship, personal needs or longevity conducted by the [DMAHS] in the absence of a regulation or statute. The unwritten 50-50 rule is a bare, unsupported theory at best.
* * *
[DMAHS] is clearly adopting a new, unwritten rule or policy and imposing it upon petitioner. This rule has broad implications, conflicts with matrimonial statutes, conflicts with a published State Supreme Court decision [L.M. v. Div. of Med. Assistance and Health Servs., 140 N.J. 480, 659 A.2d 450 (1995)]. Consequently the unwritten policy is deserving of rule making process. . . . [P]etitioner is entitled to a fair and reasonable benefit of the published law for which notice has been given. In re Keri, 181 N.J. 50, 69, 853 A.2d 909 (2004) (holding that Medicaid planning completed within the law is permissible). Petitioner must not be held to the standards of in-house agency policies. [Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984).] Thus, the agency action decision was not grounded upon settled legal principles.
* * *
Based upon the facts, testimony and evidence presented at the hearing, I conclude and order that petitioner's Medicaid eligibility shall be calculated based upon the asset ownership set forth in the property settlement, less monies spent subsequent to that date. I further conclude that the asset allocation arrived at by the petitioner and approved by the Superior Court was reasonable and consistent with the provisions contained in N.J.S.A. 2A:34-3. Therefore, the asset allocation contained in the property settlement agreement represents a distribution of assets for fair value. The action and decision by respondents is reversed.
The OCBSS filed exceptions and appealed. The DMAHS Director reversed, upholding the transfer penalty calculated by OCBSS. The Director found that the petitioner did not rebut the presumption of N.J.A.C. 10:71-4.7(i) that the transfer of more than fifty percent of the marital estate was a transfer "for less than fair value in order to qualify for Medicaid." This appeal followed.
We begin our analysis of the Director's decision mindful of our limited scope of review from the final determination of a State administrative agency. As summarized by the Supreme Court,

*1073 Though sometimes subsumed in the search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. [Pub. Serv. Elec. & Gas Co. v. NJ Dep't of Envtl. Prot., 101 N.J. 95, 103, 501 A.2d 125 (N.J.1985) (citations omitted).]
An agency's interpretation of the operative law and its own rules and regulations is entitled to prevail as long as it is not "plainly unreasonable." Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984). However, when an agency's decision is plainly mistaken, in the interest of justice we will decline deference to its decision. P.F. v. N.J. Div. of Developmental Disabilities, 139 N.J. 522, 530, 656 A.2d 1 (1995); see also Micheletti v. State Health Benefits Comm'n, 389 N.J.Super. 510, 913 A.2d 842 (App.Div. 2007).
Medicaid was enacted in 1965 as Title XIX of the Social Security Act, and is a joint federal and state program to provide a safety net for payment of medical bills for low-income individuals who are elderly, blind or disabled. See Atkins v. Rivera, 477 U.S. 154, 156, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131, 137 (1986). Medicaid is the only government program for payment of long-term nursing home care. To participate, a state must operate in compliance with federal statutes and regulations. United Hosps. Med. Ctr. v. State, 349 N.J.Super. 1, 4, 793 A.2d 1 (App.Div.2002)(citing Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784, 794 (1980)). It must also adopt "`reasonable standards . . . for determining eligibility for . . . medical assistance [that is] consistent with the objectives' of [the Medicaid program]" [and] "provide for taking into account only such income and resources as are . . . available to the applicant. . . ." Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 166, 712 A.2d 188 (1998) (quoting L.M. v. State, Div. of Med. Assistance & Health Servs., 140 N.J. 480, 484, 659 A.2d 450 (1995)); 42 U.S.C.A. § 1396a(a)(17)(A)-(B).
DMAHS is the agency charged with responsibility for the administration of the Medicaid program within this State. Such administration includes the promulgation and adoption of regulations governing qualification for Medicaid benefits, as well as serving as gatekeeper to prevent individuals from using Medicaid to avoid payment of their fair share for long-term care. N.J.S.A. 30:4D-1 to -19.1. See Estate of F.K. v. Div. of Med. Assistance & Health Servs., 374 N.J.Super. 126, 134, 863 A.2d 1065 (App.Div.), certif. denied, 184 N.J. 209, 876 A.2d 283 (2005).
In this case, W.T. sought Medicaid benefits as a "medically needy" person whose income and resources were insufficient to finance the cost of necessary medical care. See Mistrick, supra, 154 N.J. at 166-67, 712 A.2d 188. In this State, eligibility for Medicaid requires that an applicant not have resources of more than $2,000. N.J.A.C. 10:71-4.5(c). Such resources include "any real or personal property which is owned by the applicant . . . and which can be converted to cash to be used for his/her support and maintenance." N.J.A.C. 10:71-4.1(b).
At the time of W.T.'s application, Medicaid requirements mandated a transfer penalty for transfer of resources for less than fair market value during a thirty-six month *1074 look back period.[2]U.S.C.A. § 1396p(c)(1); N.J.S.A. 30:4D-3i(15)(b); N.J.A.C. 10:71-4.10. The transfer penalty is calculated by dividing the uncompensated portion of the transferred resource by the monthly average cost of nursing home care in this State. N.J.A.C. 10:71-4.7(b)(4), 10:71-4.10(c). Transfers of resources within the stated time frame are presumed to be improperly motivated to obtain Medicaid eligibility, a presumption which can be rebutted by proofs "that the assets were transferred exclusively (that is, solely) for some other purpose" than Medicaid qualifications. N.J.A.C. 10:71-4.10(j).
Nonetheless, middle-class citizens facing financial ruin because of astronomically costly and necessary medical treatment are permitted to shed assets to the point of poverty to meet the "truly needy" prerequisite for Medicaid assistance. While our State has adopted the medically needy nursing home program to shield some of the institutionalized spouse's income as an allowance to the "community spouse," that amount is often insufficient, giving rise to further Medicaid planning. See H.K. v. Dep't of Human Servs., 184 N.J. 367, 379, 877 A.2d 1218 (2005) ("Timely transfer of property, even if done to achieve eligibility status, is permissible"); In re Keri, 181 N.J. 50, 62, 853 A.2d 909 (2004); In the Matter of Manuel L. Labis, 314 N.J.Super. 140, 714 A.2d 335 (App.Div.1998).
Various planning methods have been employed to qualify for Medicaid assistance. See, e.g., Jo-Anne Herina Jeffreys, Medicaid Planning for Married Couples, 17 Nat'l Acad. of Elder L. Att'ys, 3 (2004). A choice often made by elderly married couples is divorce, accompanied by a transfer of marital assets to the non-institutionalized spouse. The sad consequences of ending a long-term marriage for reasons of Medicaid have been noted by our Supreme Court, which has expressed concern about Medicaid policies "that are so restrictive that they encourage married couples, like L.M. and his wife . . . to sever the bonds of a fifty-three-year-old marriage that they would otherwise preserve at all costs." L.M., supra, 140 N.J. at 500, 659 A.2d 450. See also, Michael Farley, When "I Do" Becomes "I Don't": Eliminating the Divorce Loophole to Medicaid Eligibility, 9 Elder L.J. 27 (2001).
As stated in In the Matter of Shah, 257 A.D.2d 275, 694 N.Y.S.2d 82 (1999),
[N]o agency of the government has any right to complain about the fact that middle class people confronted with desperate circumstances choose voluntarily to inflict poverty upon themselves when it is the government itself which has established the rule that poverty is a prerequisite to the receipt of government assistance in the defraying of the costs of ruinously expensive, but absolutely essential, medical treatment.
[Id. at 87.]
In reviewing determinations of Medicaid eligibility based on an applicant's resources in the context of divorce, our courts have drawn a distinction between assignment of income and transfer of assets pursuant to equitable distribution. In Estate of G.E. v. Div. of Med. Assistance & Health Servs., 271 N.J.Super. 229, 638 A.2d 833 (App.Div.1994), we affirmed the decision of the DMAHS that assignment of a portion of the petitioner's monthly income benefits through a Qualified Domestic Relations Order did not exclude the amount from calculation of an applicant's available income. Similarly, in H.K. v. Div. of Med. Assistance & Health Servs., 379 N.J.Super. 321, 878 A.2d 16 (App.Div.), *1075 certif. denied, 185 N.J. 393, 886 A.2d 663 (2005), we held that a consent order in a bed and board divorce for payment of support from an institutionalized spouse's pension could not increase the permissible spousal allowance under N.J.S.A. 10:71-5.7(c). We further held that the "court order" exception of N.J.A.C. 10:71-5.7(f) is not applicable to an uncontested divorce proceeding when the judge incorporates a PSA in the judgment but without specific findings as to its terms. Id. at 329-30, 878 A.2d 16.
However, in L.M., supra, 140 N.J. 480, 659 A.2d 450, the Supreme Court made a clear distinction between assignment of income and a change in ownership of assets resulting from equitable distribution. In that case the PSA provided that the wife received upon divorce her husband's pension interest as an asset transferred through equitable distribution. The Court rejected the position of the DMAHS that there was no valid distinction between assignment of income and change in asset ownership of a pension. The Court grounded its decision on the primacy of New Jersey matrimonial law, inclusive of assignment or transfer of asset ownership by equitable distribution. The Court stated:
Despite the deference we generally accord to an agency's interpretation of the operative law, the decision of the Director of DHS-DMAHS to attribute the pension income to L.M. after the pension was equitably distributed to his wife cannot stand. The decision is inconsistent with New Jersey's law of equitable distribution.
* * *
New Jersey's rule that treats pension benefits as an asset appropriate for equitable distribution during divorce proceedings cannot plausibly be regarded as inconsistent with federal Medicaid-eligibility standards: the principal application of our rule focuses on the fair division of pension assets between divorcing parties, and only incidentally affects Medicaid eligibility. Although the rule's collateral impact on Medicaid may justify regulatory action . . . its predominate relationship to equitable distribution of marital assets demonstrates that the rule cannot fairly be regarded as one that frustrates the objectives of the Medicaid program.
[L.M., supra, 140 N.J. at 498-99, 659 A.2d 450.]
In L.M., the Supreme Court recognized that its decision carried the risk of abuse through the dissolution of long-term marriages by collusive actions for divorce in order to evade Medicaid restrictions, thereby adding to the costs of relief for the truly needy.
[W]e note the Attorney General's concern that a disposition of this appeal in a manner favorable to L.M. might encourage persons to divorce to protect assets for the spouse of the nursing-home resident. That incentive, the Attorney General points out, might persist even if the Governor's proposal to cover nursing-home services through the medically needy program becomes law because persons could seek to transfer assets such as pensions through equitable distribution instead of spending down their income on their care. That would unfairly place a further burden on the limited financial resources of the State.
[Id. at 500, 659 A.2d 450.]
Accordingly, the Court recommended that the Department of Health
[I]mplement policies to prevent persons from evading the rules of the Medicaid system to avoid paying their appropriate share for long-term care. Either the Secretary or DHS-DMAHS might further that objective by considering adoption of a regulation that addresses the *1076 effect on available income of the transfer of pension benefits by equitable distribution primarily for the purpose of achieving Medicaid eligibility.
[Ibid.]
Ten years after L.M., we added our own suggestion that because of the importance of clear guidelines to assist families in Medicaid planning, regulations should be adopted "to address an appropriate balance between legitimate provisions for divisions of property and income in cases of divorce, and protection of the intended purpose of the medically needy nursing home program." H.K. v. Div. of Med. Assistance & Health Servs., supra, 379 N.J.Super. at 331, 878 A.2d 16. Unfortunately, no such regulations have been adopted. However, it appears from this record that there is an uncodified, unpromulgated, and unannounced in-house rule or policy that matrimonial settlements or divorce judgments providing equitable distribution of less than fifty percent of marital assets to an incapacitated spouse require a penalty for an impermissible transfer when made within the look back period.
We agree with the ALJ that any such in-house rule or policy violates the Administrative Procedure Act as administrative rule-making pursuant to N.J.S.A. 52:14B-23. See Metromedia, Inc., supra, 97 N.J. at 331-32, 478 A.2d 742. Moreover, this policy conflicts with New Jersey matrimonial law, which rejects the mechanical procedure of a fifty/fifty division of marital assets adopted in community property states, in favor of the division of marital property based on application of equitable principles to the concept of marriage as a partnership, and giving recognition to the economic and non-economic contributions of each party. Painter v. Painter, 65 N.J. 196, 211-13, 320 A.2d 484 (1974); Chalmers v. Chalmers, 65 N.J. 186, 194, 320 A.2d 478 (1974). Indeed, an automatic fifty/fifty distribution of assets was disapproved by our Supreme Court. Rothman v. Rothman, 65 N.J. 219, 232, n. 6, 320 A.2d 496 (1974); see also Stout v. Stout, 155 N.J.Super. 196, 205, 382 A.2d 659 (App.Div.1977); Skoloff and Cutler, supra, § 6.1B.
Therefore, any policy or in-house rule of DMAHS imposing a penalty for a transfer of assets as equitable distribution of more than fifty percent to the non-institutionalized spouse is contrary both to New Jersey public policy and statutory law which have primacy. L.M., supra, 140 N.J. at 498, 659 A.2d 450; N.J.S.A. 2A:34-3. See Mansell v. Mansell, 490 U.S. 581, 587, 109 S.Ct. 2023, 2028, 104 L.Ed.2d 675, 684 (1989); Washington Dep't of Soc. and Health Servs. v. Bowen, 815 F.2d 549, 556 (9th Cir.1987)("The Medicaid statute does not expressly provide for the preemption of State family property law."); Purser v. Rahm, 104 Wash.2d 159, 169, 702 P.2d 1196 (1985), cert. dismissed, 478 U.S. 1029, 107 S.Ct. 8, 92 L.Ed.2d 763 (1986)("Nothing in the Medicaid statute or regulations establishes federal criteria for determining ownership of income.").
While not disavowing any policy of imposing a transfer penalty for unequal equitable distribution to the non-institutionalized spouse, the DMAHS Director disclaimed reliance upon any in-house rule or policy in reversing the decision of the ALJ. She wrote:
[T]he property settlement makes it clear that W.T. and his wife intend to have Medicaid pay for his care. This is not an "in house" agency policy. A transfer penalty based on Petitioner's acquiescing to the property agreement which was explicit in its plan to qualify him for Medicaid is supported by regulation. N.J.A.C. 10:71-4.10(b). While Medicaid planning is permissible, applicants must *1077 still face the penalties associated with such planning.
The Director relied upon our decision in H.K., supra, 379 N.J.Super. 321, 878 A.2d 16. However, as we have noted, H.K. held that a consent order assigning pension benefits as alimony could not reduce an applicant's income to qualify for Medicaid; it did not address the voluntary transfer of ownership of marital property which was considered a proper means of Medicaid planning in L.M., supra.
The Director also stated:
Furthermore, the New Jersey courts have opined that a property "agreement which would leave a spouse a public charge or close to it, or which would provide a standard of living far below that which was enjoyed both before and during the marriage would probably not be enforced by any court. See e.g., Newman v. Newman, 653 P.2d 728 (Colo.Sup.Ct.1982)." Marschall v. Marschall, 195 N.J.Super. 16, 30-31 [477 A.2d 833] (Ch.Div.1984). See also DeLorean v. DeLorean, [211 N.J.Super. 432] 511 A.2d 1257, 1260 (1986)("So long as a spouse is not left destitute or as a public charge the parties can agree to divide marital assets in any manner they wish").
Courts in other states have directly addressed the issue of using a divorce proceeding to accelerate Medicaid and have held that relieving one spouse from responsibility for spousal maintenance in order to force the other spouse into poverty and shift the responsibility to Medicaid violates public policy in general and the underlying policy of the Medicaid Act. See Lowes v. Lowes, 650 N.E.2d 1171 (1995)("A former spouse should not be relieved entirely of his maintenance obligation only to qualify the disabled spouse for Medicaid, any more than a noncustodial parent should be relieved of his child support obligations to qualify the custodial parent for Aid to Families with Dependent Children") and Eichenholz v. Eichenholz, 407 N.W.2d 699 (1987).
However, in this case the PSA did not force W.T. into poverty or leave him a public charge. He received $250,000 or near forty percent of the marital estate. Accordingly, the cases relied upon by the Director are not pertinent or are actually contrary to the Director's position. In Lowes v. Lowes, 650 N.E.2d 1171, 1176 (Ind.Ct.App.1995) a former wife suffering from multiple sclerosis successfully resisted her ex-husband's application to terminate support and impoverish her so that she could become Medicaid eligible.
Similarly, in Eichenholz v. Eichenholz, 407 N.W.2d 699, 702 (Minn.App.1987), a former husband's application for a support decrease to qualify him for public assistance was denied. In DeLorean v. DeLorean, 211 N.J.Super. 432, 511 A.2d 1257 (Ch.Div.1986) the holding was that since the wife was not left destitute, the antenuptial agreement was not unconscionable and was enforceable. Id. at 437, 511 A.2d 1257. Accord, Marschall v. Marschall, 195 N.J.Super. 16, 30-31, 477 A.2d 833 (Ch.Div.1984)(dicta).
As the result of a tragedy, it was accepted by all that whatever remained of W.T.'s life would be spent at the Barnegat Nursing Home, with his standard of living remaining consistent. With a much longer life expectancy before her and an inability to produce additional income (due to her age), M.T. faced a much greater diminution of her living standard without significant asset distribution of the marital assets as an income source. In light of the circumstances, the different tax consequences from the IRA distribution, and an application of the factors set forth in N.J.S.A. 2A:34-23.1, the PSA executed by the parties cannot be held unconscionable. Indeed, *1078 a judgment of divorce setting forth this plan of equitable distribution would be upheld as a proper exercise of discretion. See Smith v. Smith, 72 N.J. 350, 360, 371 A.2d 1 (1977)(" . . . trial judges should have the utmost leeway and flexibility in determining what is just and equitable in making allocations of marital assets. . . ."); Rolnick v. Rolnick, 262 N.J.Super. 343, 355, 621 A.2d 37 (App.Div.1993).
We disagree with the Director's conclusion that "the property settlement makes it clear that W.T. and his wife intend to have Medicaid pay for his care." The PSA clearly states that it is intended to provide M.T. with sufficient income, supplemented by social security benefits when available to her, to enable her "to support herself and compensate for the loss of the Husband's income and not jeopardize the Husband's eligibility for Medicaid benefits" (emphasis added). The provision does not manifest an intent to strip W.T. of assets to attain Medicaid eligibility, but rather an intent to provide sufficiently for M.T. while leaving W.T. with assets of $250,000 to pay his necessary expenses over some or much of his limited lifespan and thereby avoid Medicaid disqualification. That is, the PSA transfer of assets by equitable distribution has as its purpose something other than Medicaid benefits for W.T., and therefore meets the requirement of N.J.A.C. 10:71-4.10(f).
Furthermore, the Director's conclusion that the intent of W.T. and M.T. was to circumvent Medicaid regulations is contrary to the determination of the ALJ based on his evaluation of the credibility of both M.T. and attorney Goldring. Generally, it is not for a reviewing court or an agency head to reject a determination based on credibility when it was the ALJ who heard the testimony and was in the proper position to judge credibility. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587, 538 A.2d 794 (1988). What was found credible by the ALJ was the testimony of the petitioner's witnesses that the intent of the PSA was not to circumvent Medicaid law and regulations, but to serve the independent purpose of a fair and equal distribution of marital assets in accordance with the matrimonial laws of this State.
We therefore conclude that the decision and resultant order of the DMAHS Director was arbitrary and without basis in law and therefore requires reversal. We add only what we previously suggested in H.K., supra, 379 N.J.Super. at 330-31, 878 A.2d 16, that regulations be adopted in accordance with the APA, to give clear guidelines to families who may engage in Medicaid planning both as to what is a proper division of assets in the event of divorce (consistent with the protection of the Medicaid program and New Jersey matrimonial law) and as to what constitutes a collusive transfer, subjecting the applicant to penalty.
Reversed.
NOTES
[1] The twenty-two month penalty was based on calculation of the difference in the asset division of $71,709.24 as well as an additional $79,807 for incremental gifts subsequently made by W.T. to his daughter. No appeal is taken from the amount gifted by W.T. and our decision is restricted to the issue of the effect of the PSA on W.T.'s Medicaid application.
[2] On February 8, 2006, President Bush signed the federal Deficit Reduction Act of 2005, Pub.L. No. 109-171, 109 Stat. 1932 (2006), which extended the look back period to sixty months for transfers after the date of enactment.