**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5962-17T3

D.Z.,

     Petitioner-Appellant,

v.

OCEAN COUNTY BOARD
OF SOCIAL SERVICES,

     Respondent-Respondent.

_____

Submitted May 28, 2020 – Decided June 23, 2020

Before Judges Suter and DeAlmeida.

On appeal from the New Jersey Department of Human Services, Division of Medical Assistance and Health Services.

SB2 Inc., attorneys for appellant (Laurie M. Higgins, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent Division of Medical Assistance and Health Services (Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner D.Z. appeals from the December 18, 2019 amended final agency decision of the Division of Medical Assistance and Health Services (DMAHS) finding her eligible for Medicaid benefits but imposing a penalty of $207,525.93 for assets D.Z. transferred during the five-year look-back period established in N.J.A.C. 10:71-4.10. We affirm.

I.

The following facts are derived from the record. D.Z., through her son and power of attorney, R.Z., applied to respondent Ocean County Board of Social Services, a county welfare agency (CWA), for Medicaid benefits. The CWA found D.Z. eligible for benefits as of August 1, 2016, but imposed an eligibility penalty for August 1, 2016, to April 25, 2018, because she transferred $210,579.16 during the look-back period.

D.Z. requested a fair hearing with respect to the transfer penalty. The matter was transferred to the Office of Administrative Law, where a fair hearing was held before an Administrative Law Judge (ALJ). At the hearing, R.Z. testified that D.Z. hired three health care aides to assist her at her home in the years before she was transferred to a nursing facility. He identified the aides by

their full names, although we refer to them as E.D., L.O., and N.L. to protect D.Z.'s confidential medical records.

R.Z. testified the aides assisted D.Z. with dressing, ambulating, bathing, cooking, cleaning, and laundry in rotating shifts of two and one-half days each. He testified that one aide lived with D.Z. full time for several months. According to R.Z., E.D. and L.O. were paid approximately $13 to $15 per hour, and N.L. was paid approximately $700 to $750 per week.

D.Z. paid the aides by check. On approximately 125 checks, she wrote "cash" as the payee and the individual aide's first name or nickname in the memo line. R.Z. testified that D.Z. sometimes wrote checks for more than the aide was due in pay, with the excess to be used to purchase items for D.Z. In those instances, the notation in the memo line contained both the aide's first name and the name of the store at which the purchase was to be made. According to R.Z., he had authority to sign his mother's checks and wrote some of the checks admitted into evidence for the aides' services and other expenses.

On most of the checks, the handwritten name in the memo section matched the signed endorsement on the back of the check. However, two of the checks had only the name of a store written in the memo section, with a signed endorsement on the back by one of the aides. Two other checks were endorsed

by someone other than the person listed in the memo section. One check endorsed by N.L. had no name in the memo section.

A few additional checks were written to three additional aides identified by R.Z. as substitutes when one of the three regular aides was unavailable. One check was written to Sears with a notation in the memo line of "carpet cleaning." Two checks were written to D.Z.'s homeowners' association for fees and three checks were written to the township to pay local property taxes on her residence.

The three aides did not testify at the hearing. R.Z. testified that his attempt to secure their testimony proved futile.

On May 11, 2018, the ALJ issued an initial decision modifying the amount of the transfer penalty. The ALJ found D.Z. proved by a preponderance of the evidence she paid E.D., L.O., and N.L. for home health care and the payments were not subject to the look-back penalty because they were exclusively for a purpose other than to qualify for Medicaid. N.J.A.C. 10:71-4.10(j).

In addition, the ALJ determined D.Z.'s payment of homeowners' association fees, local property taxes, and the carpet cleaning expense were excludable from the transfer penalty. The ALJ ordered that the transfer penalty

A-5962-17T3

be reduced by the amounts D.Z. paid to the three aides and for personal expenses.[1] This totaled a reduction of $104,425.23 from the transfer penalty.

On July 12, 2018, the Director of DMAHS issued a final agency decision adopting in part, and reversing in part, the ALJ's initial decision. The Director determined D.Z. failed to establish the type of services provided to her, the compensation she provided for those services, or that the compensation was not greater than the prevailing rates for similar care or services in the community. See N.J.A.C. 10:71-4.10(b)(6)(ii) and (j).

The Director also concluded that although the ALJ's credibility determination was entitled to deference, the record did not satisfy the residuum rule. See N.J.A.C. 1:1-15.5(b). That rule provides that when an ALJ relies on hearsay testimony, "some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness." Ibid.

The Director found the record contained no evidence: (1) of a caregiver agreement establishing the expectations of care and compensation for services between D.Z. and her aides; or (2) that the aides were certified home health aides

---

[1] The ALJ found D.Z. did not prove her payments to the temporary aides constituted payments excluded from the transfer penalty.

warranting compensation at the rates D.Z. paid.  In addition, the Director determined the checks in evidence: (1) did not show a consistent pattern of payments; (2) showed multiple payments to the same aide on the same day in one instance; (3) demonstrated payments to L.O. at a time R.Z. testified N.L. lived with his mother fulltime; and (4) were issued at a time when D.Z.'s daughter-in-law, according to her testimony, was caring for D.Z.  The Director also concluded the record did not establish what services were provided to D.Z. by the aides during the overnight hours.

The Director, therefore, reversed the ALJ's initial decision to the extent it deducted from the transfer penalty the payments D.Z. claimed were for the services of the aides.  The Director adopted the portion of the ALJ's initial decision directing the CWA to deduct from the transfer penalty $3,053.23 to reflect D.Z.'s payments for homeowners' association fees, local property taxes, and carpet cleaning.  This resulted in a transfer penalty of $207,525.93.

This appeal followed.  D.Z. raises the following arguments for our consideration:

> POINT I
>
> RESPONDENT FAILED TO MAKE NEW OR MODIFIED FINDINGS OF FACT AS REQUIRED BY LAW UPON REJECTING THE ALJ'S FINDINGS OF FACT.

A-5962-17T3

POINT II

RESPONDENT FAILED TO GIVE PROPER DEFERENCE TO THE FACT FINDER'S ASSESSMENT OF THE CREDIBILITY OF WITNESSES.

POINT III

RESPONDENT REVIEWED AN INCOMPLETE RECORD, WITHOUT THE TRANSCRIPT, IN ORDER TO ASSESS THE TESTIMONY AND EVIDENCE SUBMITTED TO THE COURT.

POINT IV

RESPONDENT INCORRECTLY APPLIED THE RESIDUUM RULE IN ASSESSING THE ALJ'S INITIAL DECISION.

After D.Z. submitted her brief, the Director moved for a limited remand. The Director sought to clarify what she described as "a fundamental misunderstanding caused by a lack of analysis in the" final agency decision. We granted the motion.

On December 18, 2019, the Assistant Commissioner of DMAHS issued an amended final agency decision. The amended final agency decision reiterates the findings in the earlier final agency decision and concludes D.Z.

> has not been able to rebut the presumption that these transfers for less than fair market value were to qualify for Medicaid. And, because [D.Z.] has provided

7

inadequate support to rebut the presumption, [D.Z.] cannot show that the transfers were not made in order to qualify for Medicaid.

The Assistant Commissioner again reversed the ALJ's initial decision to the extent it ordered the CWA to reduce the transfer penalty by the amounts D.Z. claimed to have paid her aides and adopted the portion of the ALJ's initial decision ordering a reduction in the transfer penalty to reflect D.Z.'s payment of homeowners' association fees, local property taxes, and personal expenses.

In a reply brief filed after issuance of the amended final agency decision, D.Z. raised the following arguments:

POINT I

RESPONDENT SHALL NOT EVALUATE THE MERITS OF PETITIONER'S TRANSFERS OF ASSETS BUT ONLY DETERMINE WHETHER OR NOT THE TRANSFER[S'] PURPOSE WAS TO ESTABLISH MEDICAID ELIGIBILITY.

POINT II

RESPONDENT ACKNOWLEDGES THAT THE ALJ FOUND THAT PETITIONER RECEIVED SERVICES FROM THE CAREGIVERS FOR HER PAYMENTS, WHICH SHOULD REBUT THE PRESUMPTION.

II.

"An administrative agency's decision will be upheld 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair

8

support in the record.'" R.S. v. Div. of Med. Assistance & Health Servs., 434 N.J. Super. 250, 261 (App. Div. 2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 349 (App. Div. 2010) (alteration in original) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006)). "[I]f substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992).

"Medicaid is a federally-created, state-implemented program that provides 'medical assistance to the poor at the expense of the public.'" In re Estate of Brown, 448 N.J. Super. 252, 256 (App. Div. 2017) (quoting Estate of DeMartino v. Div. of Med. Assistance & Health Servs., 373 N.J. Super. 210, 217 (App. Div. 2004)); see also 42 U.S.C. § 1396-1. To receive federal funding the State must comply with all federal statutes and regulations. Harris v. McRae, 448 U.S. 297, 301 (1980).

9

Pursuant to the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5, DMAHS is responsible for administering the Medicaid program in our State. Through its regulations, DMAHS establishes "policy and procedures for the application process . . . ." N.J.A.C. 10:71-2.2(b). "[T]o be financially eligible, the applicant must meet both income and resource standards." Brown, 448 N.J. Super. at 257; see also N.J.A.C. 10:71-3.15; N.J.A.C. 10:71-1.2(a).

Because Medicaid funds are limited, only those applicants with income and non-exempt resources below specified levels may qualify for government-paid assistance. To qualify for the Medicaid Only program, an individual applicant may not have resources that exceed $2000. N.J.A.C. 10:71-4.5(c). Resources are defined "as any real or personal property which is owned by the applicant . . . and which could be converted to cash to be used for his or her support and maintenance." N.J.A.C. 10:71-4.1(b).

An applicant who transfers or disposes of resources for less than fair market value during a sixty-month look-back period before the individual becomes institutionalized or applies for Medicaid is penalized for making the transfer. 42 U.S.C. §1396p(c)(1)(E); N.J.A.C. 10:71-4.10(m)(1). Transfers within the look-back period are presumed to be made to obtain earlier Medicaid

10

eligibility than that to which the applicant would otherwise be entitled. N.J.A.C. 10:71-4.10(j). The presumption may be rebutted with "convincing evidence that the assets were transferred exclusively (that is, solely) for some other purpose." Ibid. If the applicant does not overcome the presumption, a transfer penalty denies Medicaid benefits during the period the applicant should have been using the transferred resources for medical care. See W.T. v. Div. of Med. Assistance & Health Servs., 391 N.J. Super. 25, 37 (App. Div. 2007).

If the applicant transfers any resource within the look-back period, the transfer is reviewed, and the resource's fair market value is ascertained, as is the consideration received for the transferred resource. N.J.A.C. 10:71-4.10(c). The difference between the fair market value of the resource and the compensation received by the applicant is the "uncompensated value . . . ." N.J.A.C. 10:71-4.10(c)(2). If the uncompensated value of the transferred resources, combined with other countable resources, exceeds the resource limit for Medicaid eligibility, a transfer penalty is assessed. N.J.A.C. 10:71-4.10(m)(1).

Having carefully reviewed the record and applicable legal principles, we conclude the agency's decision is supported by substantial credible evidence in the record as a whole. R. 2:11-3(e)(1)(D). Accordingly, we affirm the Assistant

A-5962-17T3

Commissioner's amended final agency decision for the reasons set forth therein. We add the following comments.

The Assistant Commissioner did not reject the ALJ's determination that R.Z. credibly testified that D.Z. paid aides to assist her. She concluded, however, that D.Z. did not establish that the amount she paid the aides reflected fair market value for the services she received. As the Assistant Commissioner noted, the record contains no service contract memorializing the aides' compensation rate, the services they were expected to provide, or that they were licensed caregivers whose skill warranted the compensation they received. We acknowledge DMAHS regulations do not require a written contract or licensing for home health services to qualify as exempt from the transfer penalty. However, the absence of a contract and proof of licensing here significantly hindered the agency's ability to determine the services D.Z. received, the rate she paid for those services, and whether that rate was warranted by the aides' skill level and training.

In addition, the evidence was imprecise with respect to the compensation paid to the aides. Among other things, the checks upon which D.Z. relied were made out to "cash," in some instances conflated the aides' compensation with D.Z.'s personal expenses without clear delineation, and were issued at

inconsistent frequencies. Because the agency could not determine the fair market value of the services D.Z. received or the amount of compensation she gave to the aides, the agency could not award a credit against the transfer penalty commensurate with the fair market value of services rendered. Based on this record, we cannot conclude the Assistant Commissioner's determination D.Z. failed to overcome the presumption that the transfers were for a purpose other than qualifying for Medicaid was arbitrary, capricious, or unreasonable.

We have reviewed petitioner's remaining arguments and conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5962-17T3